THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MICHAEL ROSARIO and MICHAEL SMITH, Appellants.

Second Department, July 5, 1983

### APPEARANCES OF COUNSEL

*Michael Vincent Ricci* for Michael Rosario, appellant.

*William E. Hellerstein* (*Robert Dean* of counsel), for Michael Smith, appellant.

*John J. Santucci, District Attorney* (*Thelma Lee* of counsel), for respondent.

### OPINION OF THE COURT

MANGANO, J.

These appeals again present the issue of whether a police officer may detain at gunpoint an individual whom he reasonably suspects of having committed a crime. Specifically, on the instant appeals defendants argue that even if the police had reasonable suspicion to suspect them of having committed a burglary and had the right to stop

their car and temporarily detain them, they had no right to draw their guns to effectuate the stop. Accordingly, defendants argue that this gunpoint seizure was unlawful at its inception, that any fruits of the burglary discovered during the course of that detention must be suppressed as the fruits of the poisonous tree, and that the indictment must be dismissed.

We disagree with defendants' argument and, therefore, affirm the judgments of conviction.

On August 23, 1981, at approximately 4:30 A.M., Police Officer Douglas Brussell was on radio motor patrol with his partner in a marked police vehicle, in the vicinity of Main Street and 41st Avenue, in Queens County. They received a radio run from central communication concerning a burglary in progress at a florist shop located at 150th Street and 14th Avenue, in Queens. After driving for approximately 7 to 10 minutes, the officers arrived at 150th Street and 14th Avenue and, from a distance of about one half of a block, they observed a brown Datsun 280Z, without its lights on, pull out of a closed gas station, located about two doors down from the florist, at a high rate of speed.

The officers pursued the Datsun and pulled abreast of the vehicle when it stopped at a traffic light approximately three and one-half blocks away. Upon pulling alongside the vehicle, Officer Brussell's partner extended his gun through the window of the police car and pointed it at the driver of the Datsun, defendant Smith. The officer told Smith to turn off the ignition and place his hands on the dashboard. As another car pulled in front of the defendants' vehicle, Officer Brussell, also with his gun drawn, walked to the passenger side of the car, where defendant Rosario was seated. Upon passing the rear of the vehicle with his flashlight illuminated, Brussell noticed a blue milk crate containing floral arrangements, cactus plants and ceramic pieces, which were in plain view through the glass window of the Datsun's hatchback. When Brussell approached the passenger side of the car, he observed a dozen roses protruding from between the legs of defendant Rosario. Thereupon, the defendants were taken from the vehicle and placed under arrest. At no time was Smith, the

driver, asked for his license and registration, nor was he issued a summons for any traffic violation.

The officers returned to the florist shop with defendants and found that the window of the shop had been broken. The owner of the store, who had arrived in the interim, identified the property in the Datsun as belonging to him.

In denying the defendants' motions to suppress the physical evidence discovered in their car, Criminal Term stated: "on the issue in question of the police officers' guns being drawn, the Court had heard testimony that Officer Brussell was responding to a police radio alarm, burglary in progress * * * [A]ny police officers responding to a radio alarm that indicates a crime such as a burglary in progress * * * would certainly authorize such officers upon the apprehension of any suspects to draw their guns".

It is beyond cavil that the presence of probable cause is not a necessary element for all encounters between police and the citizenry during investigations of criminal activity (see *United States v Mendenhall,* 446 US 544, opn of STEWART, J., in which REHNQUIST, J., joined). It is well settled that under appropriate circumstances, the police may briefly detain and question a person in a public place on information that does not rise to the level of probable cause, "for, until an actual arrest occurs, the Constitution demands only that the action of the police be justified at its inception and reasonably related in scope and intensity to the circumstances surrounding the encounter" (*People v Finlayson,* 76 AD2d 670, 674, cert den 450 US 931; *People v Cantor,* 36 NY2d 106, 111; *Terry v Ohio,* 392 US 1, 20).

In *People v De Bour* (40 NY2d 210) the Court of Appeals set forth four levels of police intrusion and the degree of knowledge and credible belief "needed to justify each" level (*People v Finlayson,* 76 AD2d 670, 676, *supra*). Among the levels of permissible police instruction set forth in *De Bour,* and codified by statute in this State (see CPL 140.50, subd 1), is the standard of "reasonable suspicion". That term has been defined as denoting "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" (*People v Cantor,* 36 NY2d 106, 112-113, *supra*). It

has been consistently held that, where an officer entertains a reasonable suspicion concerning an individual, it is reasonable, and therefore constitutional, for him to stop and briefly detain that individual for questioning (*People v Skinner,* 48 NY2d 889; *People v Simms,* 57 AD2d 579).

With reference to an investigative stop of an automobile, both our Court of Appeals and the United States Supreme Court have clearly ruled that such a stop constitutes a "seizure" governed by the constitutional strictures against unreasonable searches and seizures, and "that, absent at least a *reasonable* suspicion that its occupants had been, are then, or are about to be, engaged in conduct in violation of law" (including traffic infractions), the stopping of an automobile constitutes an impermissible seizure (see *People v Sobotker,* 43 NY2d 559, 563; *People v Ingle,* 36 NY2d 413; *People v Cantor,* 36 NY2d 106, *supra; People v Flanagan,* 56 AD2d 658; *Pennsylvania v Mimms,* 434 US 106; NY Const, art 1, § 12; US Const, 4th Amdt).

With these fundamental principles, we can turn to the particular facts of this case.

The officers received and were entitled to rely upon the radio report of a burglary in progress at the florist shop (cf. *People v Lypka,* 36 NY2d 210). Several minutes thereafter, the police reached the scene in their marked police car and observed a car, without its lights on, pull out at a high rate of speed from a closed gas station about two doors down from the florist.

Under these circumstances, the police possessed reasonable suspicion that the car's occupants were involved in criminal activity, i.e., the burglary at the florist shop, and therefore had an adequate basis to stop the car and investigate further (see *People v Lathigee,* 84 AD2d 918).

It is argued, however, that the level of intrusiveness must also be reasonable and that under the circumstances of this case "the means that the officers used to effect the stop — pointing their guns directly at the occupants — was [*sic*] not reasonable", but "was a disproportionate response to the type of burglary indicated by the radio run".

It is to this contention that we now turn. In *Pennsylvania v Mimms* (434 US 106, *supra*), the Supreme Court held

that upon stopping a car based on reasonable suspicion that a traffic violation had occurred, the police could order the driver out of the car. Subsequent to *Pennsylvania v Mimms* (*supra*), case law in New York has evolved to a point where a valid investigatory stop of a car may be accompanied, as a protective measure, by the opening of any doors and a directive from the police to the occupants to exit the car (*People v David L.*, 56 NY2d 698, revg 81 AD2d 893; *People v Livigni*, 88 AD2d 386, affd 58 NY2d 894). Thus, in *People v David L.* (*supra*), the Court of Appeals held that where the police had lawfully stopped a car which had a defective light and was making excessive noise, they were entitled to open any door, order the driver out, and seize anything in plain view.

In *People v Livigni* (*supra*), the police lawfully stopped a car for a traffic violation, ordered the driver out and checked his papers. The police then proceeded to the passenger side and observed an empty gun holster on the front seat. The police drew their guns and ordered the passenger out. As the passenger exited, the police saw a gun on the front seat where he had been sitting. They seized the gun and placed the passenger and the driver under arrest. In a pretrial motion to suppress, the passenger argued that the police engaged in an unlawful seizure when they ordered him out of the car at gunpoint and that the evidence of the gun and a subsequent inculpatory statement had to be suppressed as the fruits of the illegal seizure. In upholding the denial of defendant's motion to suppress, this court initially took note of the "inordinate risk confronting a police officer as he approaches a person seated in an automobile to investigate a violation of law * * * due to the concealed and dangerous movements of a person seated in the vehicle" (*People v Livigni,* 88 AD2d 386, 387-389, *supra; see Pennsylvania v Mimms,* 434 US 106, 110, *supra; Adams v Williams,* 407 US 143, 148, n 3). Under these circumstances, this court held that the police order to all the occupants to exit the vehicle was authorized "simply because it was issued in the course of an investigation into [a] * * * violation involving an occupied car stopped on a public street" (*People v Livigni, supra,* p 388; see *Pennsylvania v Mimms, supra*).

In addition to this fundamental ground for ordering all of the occupants out of the car, we found the directive to the occupants to exit the car "even more justifiable" due to the presence of the empty holster on the front seat of the car "and the readily available inference that a gun was not far away" (*People v Livigni, supra,* p 388). Finally, this court held that "[t]he fact that the police order * * * was issued at gunpoint [did] not alter [the] result" (*People v Livigni, supra,* p 390). Specifically, we stated (p 390): "The police approached the vehicle to investigate a traffic violation. At that point, with guns holstered, they could have ordered all of the occupants out of the car under the holding in *Pennsylvania v Mimms* (*supra*) as interpreted by us today. That order alone would have resulted in a seizure deemed reasonable by the mere circumstance of a lawful motor vehicle stop. Nevertheless, such an order was not issued until the empty holster was observed on the front seat of the car, and then it was issued with guns drawn. The question is, therefore, not whether a seizure was authorized, but whether an otherwise lawful seizure was rendered unlawful by the amplification of its coercive nature due to the officers' drawn guns * * * But here there was other provocation — the suggestive presence of the empty gun holster (see *People v Samuels,* 50 NY2d 1035, 1037, *supra*). Facts were, therefore, available to the police at the moment of the seizure that would have warranted them as men of reasonable caution to believe that the combined action of drawing their guns and ordering the occupants out of the car was appropriate. (See *Terry v Ohio,* 392 US 1, 21-22, *supra; People v Allende* [39 NY2d 474], *supra; People v Cantor,* 36 NY2d 106, *supra.*) Faced with the usual hazards attendant upon a motor vehicle stop, which were heightened by evidence that a gun might be available for use by the occupants, the police accompanied the accepted precautionary measure of issuing an order to get out of the car with the protective action of drawing their guns. Within the context of the minimal intrusion associated with the order to exit the vehicle, the drawn guns were simply an added safety response to an added danger. (See *People v Chestnut,* 51 NY2d 14; *People v Finlayson,* 76 AD2d 670; *People v Earley,* 76 AD2d 335.)"

Concededly, in the case at bar the police did not observe a holster or any other item in the car which could have led them to believe that they were in danger. The question to be resolved therefore is: did the reasonable suspicion possessed by the police, that the car's occupants had committed a burglary, carry with it the right to approach the car with guns drawn, or did the display of guns by the police under these circumstances serve to elevate the encounter to an arrest which required probable cause?

In support of the latter proposition, defendant Smith cites *United States v Ceballos* (654 F2d 177, 182), wherein the Second Circuit Court of Appeals held that a gunpoint seizure of a car's occupants who were reasonably suspected of committing a narcotics offense "was so intrusive as to be tantamount to an arrest." Specifically, the court in *Ceballos* held (*supra,* pp 180-181, 182-184):

"The contentions of the parties may be simply stated. It is undisputed that a seizure within the meaning of the Fourth Amendment occurred. The Government contends that when the officers blocked the progress of Ceballos' car and approached with guns drawn they were performing an investigative stop which was supported by reasonable suspicion based on the information known to them, and that the circumstances immediately thereafter (the bag falling to the ground, being partially open and the glassine envelope with white powder being visible) furnished probable cause for an arrest. With respect to the force employed by the officers (blocking Ceballos' vehicle and drawing guns), the Government argues that the intrusion was justified by the seriousness of the suspected offense, the officers' fears for their personal safety, and the possibility that Ceballos would have fled, with a resulting high speed chase which might have endangered bystanders. Appellant argues that the arrest in fact took place when at least three vehicles blocked appellant's way and he was confronted by several officers, some of whom had drawn guns, and that at that point, the officers lacked probable cause to arrest appellant.

"We are thus called upon to decide whether the appellant was subjected to an 'investigatory stop' governed by the reasonable suspicion test established in *Terry v. Ohio,*

*supra,* or whether he was subjected to such a degree of force that the stop was in fact an arrest governed by the requirement of probable cause. For the reasons stated herein, we conclude that appellant was arrested when the police officers blocked the progress of his car and approached with drawn guns, and that such arrest was unsupported by probable cause.

"Thus, the initial question before us is whether the blocking of appellant's car and the approach by the officers with guns drawn was so intrusive as to be tantamount to an arrest. This question must be resolved based on the particular facts of this case, *see Sibron v. New York,* 392 U.S. 40, 67 * * *; *United States v. Vasquez, supra,* 638 F.2d at 521, and the degree of intrusion, the amount of force used, and the extent to which appellant's freedom of movement was curtailed * * *

"Rather, in this case, the officers articulated no facts which they viewed as creating a need for the use of force and a degree of intrusion beyond that generally employed in *Terry* stops. Although we agree with Judge Mishler and our dissenting brother that narcotics traffickers are often armed and violent, see *United States v. Oates,* 560 F.2d 45, 62 (2d Cir. 1977) ('we have recognized that to "substantial dealers in narcotics" firearms are as much "tools of the trade" as are most commonly recognized articles of narcotics paraphernalia') (citation omitted), that generalization, without more, is insufficient to justify the extensive intrusion which occurred in this case. If it were, any narcotics suspect, even if unknown to the agents and giving no indication that force is necessary, could be faced with a 'maximal intrusion' based on mere reasonable suspicion. The Fourth Amendment requires more to justify a 'maximal intrusion.' Similarly, the seriousness of the suspected offense cannot, without more, provide the basis for an intrusive *Terry* stop or for an arrest."

The defendant Smith seeks to extend the holding of *Ceballos* to the particular facts at bar by arguing: "Like a narcotics offense, a nighttime burglary of a florist's shop is the sort of offense that, while not minor, does not justify the use of guns in effecting a stop. The burglary of a florist's stop [*sic*] at a time when it is likely to be unoccu-

pied is a crime against property, not against people. It is unlikely that the perpetrators of such a crime would carry — or be quick to use — handguns."

We disagree with this analogy; indeed it is our view that a more appropriate starting point for a proper resolution of the question raised on appeal can be found in the decision of this court in *People v Finlayson* (76 AD2d 670, *supra*). In *Finlayson,* a police officer responded to a radio call advising of a robbery in progress at a gasoline station. Upon his arrival at the gasoline station, the station manager urgently signalled him to proceed around the corner. The officer immediately drove around the corner and observed a vehicle approximately 150 feet ahead. The officer intercepted the other vehicle, exited his car, approached the other vehicle and confronted its two occupants with his gun drawn. The officer pointed the gun at the car's occupants and ordered them to place their hands on the dashboard. After obtaining a radio description of the robbers, and determining that they matched those of the car's occupants, the officer arrested them for robbery. The car was searched and the proceeds of the robbery were discovered.

In a pretrial motion to suppress, the defendants in *Finlayson* argued that their initial detention at gunpoint had been unlawful and that, consequently, the discovery in the car of the proceeds of the robbery, a subsequent lineup identification and subsequent confession, were all inadmissible as tainted fruits of the poisonous tree. The County Court rejected these arguments, holding that the stop was properly founded upon reasonable suspicion and that the police officer's use of a gun for self-protection did not render his action improper.

In affirming the convictions and upholding the denial of defendants' motion to suppress, this court initially held that reasonable suspicion existed for the stop of defendants' car. We then addressed the question of "whether the scope and intensity of the ensuing police conduct remained reasonably related to the circumstances surrounding the encounter" (*People v Finlayson,* 76 AD2d 670, 678, *supra*). In rejecting defendants' argument that the stop, even if initially justified, was raised to an impermissible level of

intensity through the officer's display of a gun, this court specifically held (*People v Finlayson, supra,* pp 679-680):

"Thus, for example, if an officer were to draw his weapon against an individual suspected only of shoplifting or some other petty offense, the intensity of the confrontation, in the absence of any independent indication of danger, would be raised to a level well beyond that which could be justified as reasonably related to the surrounding circumstances. Such an encounter would then be deemed an arrest supportable only by probable cause. (Cf. *People v Cantor,* 36 NY2d 106, *supra.*) In contrast, if the individual were suspected of a serious or violent offense, the officer's resort to his weapon, standing alone, would not transform the confrontation into an arrest. Instead, it would be deemed a permissible act of self-protection provided only that it was reasonably related to specific and articulable facts from which it was reasonable to infer that the suspect was armed and dangerous. (*Terry v Ohio, supra,* p 27.)

"In essence, then, we speak of two separate areas of knowledge and belief. The first involves information pointing to the individual as the perpetrator of the crime. This establishes the predicate for the initial police intrusion upon the individual's liberty, and it is fundamental that no frisk or gunpoint approach may ever be sanctioned in the absence of a sufficient predicate entitling the officer to stop and detain the individual in the first instance. (Cf. *People v Earl,* 40 NY2d 941, revg 50 AD2d 289 on dissenting opn of SHAPIRO, J., cert den 431 US 943.) The second area of knowledge and belief concerns information from which it can reasonably be inferred that the suspect is armed and dangerous. The officer's right to take protective action derives from and is measured against this second area of knowledge, and the question of whether his apprehension of danger was reasonable will necessarily turn upon an examination of the totality of the surrounding circumstances. These might well include the time of day and the location at which the confrontation takes place, the number of suspects in relation to the number of officers present and, of course, the nature of the suspected offense. (Cf. *United States v Bull,* 565 F2d 869, 870, cert den 435 US 946, *supra.*) And, once again, we do not require certainty.

*(People v Chestnut,* 51 NY2d 14, *supra; Terry v Ohio, supra,* p 27.)

"Moreover, in assessing these confrontations, *it is absolutely essential that courts reach determinations based not upon some abstract or illusory notion of what police-citizen encounters ought to be like in an ideal world but upon an objective evaluation of the realities of the encounter as it occurred.* (See *Elkins v United States,* 364 US 206, 222, *supra; People v Rivera,* 14 NY2d 441, 446, cert den 379 US 978, *supra; People v Cunningham,* 71 AD2d 559, 560; see, also, *People v Crippen,* NYLJ, March 14, 1980, p 6, col 4.) The reasonableness of the officer's conduct must depend upon the actualities of life under the circumstances in which the confrontation takes place including, although not limited to, his reasonably based fears growing out of the occurrence of prior acts of violence directed at the police. Tragically, attacks upon policemen seem to have become almost commonplace in modern urban society, and courts simply cannot remain unmindful of the alarming frequency with which they occur, for as CARDOZO, J., warned, 'we are not to close our eyes as judges to what we must perceive as men.' *(People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48, 63; see, also, *Watts v Indiana,* 338 US 49, 52.)" (See, also, *People v Dominquez,* 84 AD2d 820; *People v Blakely,* 64 AD2d 926; *People v Simms,* 57 AD2d 579, *supra.)*

Although the reported crime in the case at bar was not a robbery, as was the case in *People v Finlayson (supra),* it cannot be gainsaid that it was a "serious * * * offense" within the meaning of that phrase as used by the court in *Finlayson (People v Finlayson, supra,* p 679).

The seriousness of the crime involved in the case at bar, coupled with the particularly inordinate risk which confronted the officers herein as they approached the car's occupants in the early morning hours on a deserted street to lawfully investigate that crime, constitute the hard reality by which the reasonableness of their conduct in drawing their guns should, and must, be measured. The tragic attacks upon policemen which have "become almost commonplace in modern urban society" *(People v Finlay-*

*son, supra,* p 680), bear eloquent testimony to the reasonableness of the police officers' self-protective action herein.

Accordingly, the defendants' motions to suppress physical evidence were properly denied, and the judgments of conviction must be affirmed.[*]

LAZER, J. P., GULOTTA and BRACKEN, JJ., concur.

Two judgments (one as to each defendant) of the Supreme Court, Queens County, both rendered March 26, 1982, affirmed.

The case is remitted to the Supreme Court, Queens County, for further proceedings pursuant to CPL 460.50 (subd 5).

---

[*] A denial of defendants' motions to suppress and affirmance of the judgments of conviction are warranted in any event, since the sighting of the proceeds of the burglary was inevitable, and the drawing of the police officer's gun was not a *sine qua non* of its discovery (*People v Fitzpatrick,* 32 NY2d 499, 505-507, cert den 414 US 1033; *People v Wiggins,* 50 AD2d 910; *People v Simms,* 57 AD2d 579).