■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS EDWARD GREENE, Appellant. — Appeal by defendant from a judgment of the County Court, Dutchess County (Aldrich, J.), rendered December 3, 1981, convicting him of burglary in the third degree, upon a jury verdict, and imposing

sentence. This appeal brings up for review the denial, after a hearing, of that branch of defendant's motion which sought suppression of a television set, a parka, and a translator which was seized during his arrest.

Judgment reversed, on the law and the facts, that branch of defendant's motion noted above granted, and new trial ordered.

On March 10, 1981, at around 12:10 P.M., State Trooper Thomas Fazio received a telephone call from a woman who stated that she felt uneasy because she observed a car whose driver appeared to be lost drive into her housing development. She told him that the passenger of the car was a black man and that the driver probably was black. She also gave the license number to Trooper Fazio.

Fazio entered the license number in the Department of Motor Vehicles computer, which indicated that the car was a 1974, two-door brown Oldsmobile sedan. He then radioed Trooper John Sweeney to look out for the brown Oldsmobile.

At approximately 12:20 P.M., Fazio received a report that a woman called to inform him that a black man had knocked on the rear door of her home. When her husband answered the door, the man stuttered and stammered and then asked for directions to a neighboring town. After her husband gave the directions to the man, he hurried back to a gold or light brown car which had backed into their driveway. Her husband had noted the car's license number. Fazio believed that the two calls were related. He told Sweeney about the second call and also dispatched Trooper Martin Camhi to assist in locating the vehicle.

At approximately 12:45 P.M., Sweeney noticed a brown car driven by a black male with a passenger in the front seat. He could not see the license number. Sweeney followed the car for awhile. The driver began to drive approximately 70 miles per hour. When the car stopped for a stop sign, Sweeney was able to read the license number. It corresponded to that given to him by Fazio.

Sweeney then contacted Camhi and they agreed that Sweeney would attempt to stop the car at the intersection of Route 9D and Interstate 84. When the car reached this point, Sweeney pulled it over.

Sweeney approached the car and asked the driver, Louis Jackson, for his license, registration, and insurance card. Jackson was unable to produce those documents and stated that the car belonged to defendant (the passenger) or his sister. Sweeney noticed a television set on the rear seat of the car, a parka in the

hatchback, and something which looked like a calculator (the translator) on the front seat. Sweeney asked Jackson whom the television set belonged to. Jackson stated that it belonged to defendant. Camhi arrived on the scene at this point. Defendant told Camhi that the television set belonged to him.

Sweeney then asked defendant who the television set belonged to and defendant stated that the set had always been in the car. Sweeney thereupon arrested defendant for burglary although the police at that time had no knowledge of any burglary having been committed. Sweeney took defendant to the police station, while Camhi had Jackson retrace the route he and defendant had taken. Around 10 minutes after defendant was arrested, they arrived at a house which had obviously been burglarized.

The owner of the house subsequently identified the television set.

Defendant argues that he was subjected to an unlawful arrest because the information received in the two telephone calls did not meet the standard of probable cause to arrest, and that the two statements regarding ownership of the television set made by defendant after the police stopped the car did not raise the level of information so as to provide probable cause to arrest. Defendant contends, therefore, that the evidence seized from the vehicle should have been suppressed.

The hearing court erred in denying defendant's motion to suppress the television set, the parka and the translator. Although the initial stop of the vehicle was lawful as the car was speeding (see *People v Ingle,* 36 NY2d 413), the arrest of defendant and seizure of the afore-mentioned property were not based upon probable cause (see *People v Cook,* 85 AD2d 672; *People v Richie,* 77 AD2d 667). Accordingly, the fruits of the unconstitutional conduct must be suppressed (*Wong Sun v United States,* 371 US 471; *People v Cook, supra; People v Richie, supra*). Mollen, P. J., Gibbons and Rubin, JJ., concur.

Weinstein, J., dissents and votes to affirm the judgment appealed from, with the following memorandum: By indictment No. 99/81 defendant was accused of committing the crime of burglary in the third degree by entering and remaining unlawfully in the residence of Fred Moore with intent to commit the crime of larceny therein. The second count charged him with possession of burglar's tools. A hearing was held on November 9, 1981 to determine whether evidence seized at the time of defendant's arrest, specifically, two gold watches, a chain, a screwdriver, a television set, a parka and a translator, should be suppressed.

Shortly after noon on March 10, 1981, the State Police received a telephone call from a female complainant who stated that she became uneasy after observing the somewhat erratic behavior of a car, the driver of which appeared to be lost, which proceeded onto the grounds of the housing complex where she resided. She noted that the passenger in the subject vehicle was black although she could not be certain about the race of the driver. She reported the license number of the car, which Trooper Fazio of the New York State Police entered in the Department of Motor Vehicles computer and received a response indicating that the vehicle observed was a 1974 two-door brown Oldsmobile sedan. There was no indication that said vehicle had been stolen. Upon ascertaining this information, Fazio dispatched Trooper Sweeney, who was on radio patrol at the time, to check the "suspicious vehicle". A "suspicious vehicle" was one considered questionable and worthy of investigation by the State Police notwithstanding the fact that there was, at that point, no suspicion that a crime had been committed.

Approximately 10 minutes after receiving the initial call, Trooper Fazio received a report that a second complainant, one Bernice Morris, had called in stating that a male Negro had knocked on the rear door of her residence and asked for directions to New Hamburg. When Mrs. Morris's husband responded to the knock, he encountered a black male wearing a sports coat and a fedora hat. The man, apparently surprised to find someone at home, began stammering before finally asking directions to the neighboring town. The Morrises thought the entire incident rather suspicious inasmuch as there had been no car parked in their driveway to indicate that someone might have been at home on the day in question. It was most unusual for at least one of their cars not to be parked in the driveway. As Mrs. Morris testified, it was common practice for people to be very aware of the habits of residents along the road where her home was situated. Moreover, the Morrises' home had been broken into three or four times previously. In view of their prior experiences, the Morrises strongly suspected that the black man who knocked on their door on this occasion was merely trying to ascertain whether or not someone was at home.

After giving the directions, Mr. Morris followed the intruder outside. Said individual hurried back to his vehicle which had been backed into the Morrises' driveway. The car immediately sped back down the hill leading away from the Morris residence. Mr. Morris was able to observe that the car was a brownish color. Mrs. Morris described the vehicle to police as tan or gold.

In view of the proximity in time and the similarities between the two reported instances of suspicious conduct, Trooper Fazio

reasoned that the two complaints were probably related. He recognized the fact that people sometimes describe different color shades when referring to the same vehicle. He advised Trooper Sweeney with respect to the second call and its possible relationship with the earlier report. Fazio also dispatched a second patrol to investigate the subject vehicle since he suspected that criminal activity was afoot.

At approximately 12:45 P.M., Sweeney spotted a brown car being driven by a black male with a passenger in the front seat. He was unable, at this juncture, to see the license number. Sweeney followed the vehicle, which was proceeding at a speed of 70 miles per hour, and observed that the occupants thereof had observed him. When the vehicle stopped at an intersection, Sweeney was able to read the license number. It corresponded with the number radioed to him by Trooper Fazio. Trooper Sweeney continued to follow the vehicle along Route 9D. He eventually ordered the pursued vehicle to stop at the overpass of Interstate 84 on Route 9D. The reasons for ordering the stop were that the car was "a suspicious vehicle" which matched the broadcast description and that it was being operated at an excessive rate of speed.

Sweeney approached the vehicle and asked the operator, one Louis Jackson, for his license, registration and insurance card. The driver was unable to produce these documents. In response to Sweeney's query, he stated that the vehicle belonged either to defendant, who was seated on the passenger side, or to his sister. Jackson was issued a ticket for speeding. Sweeney observed a television set in the rear seat, a tan parka jacket in the hatchback and what appeared to be a calculator (later identified as a translator) in the front seat between the passenger and driver. He thereupon asked the driver to step outside the vehicle and inquired as to the ownership of the television set. Jackson pointed to defendant in the car, indicating that he was the owner. When questioned by Sweeney, defendant responded that the set had always been in the car. However, defendant told Trooper Camhi, who also arrived on the scene, that the television belonged to him. Defendant and Jackson were placed under arrest for the crime of burglary.

The officers then conducted a search of both men. Jackson was found to be in possession of a hypodermic needle. The search of defendant's person revealed a screwdriver, two watches and a gold chain.

Defendant, after being advised of his rights, was transported by Trooper Sweeney to the State Police barracks and processed. Meanwhile, Trooper Camhi had Jackson retrace the route which

he and defendant had previously taken. Approximately 20 minutes after the arrest, Trooper Camhi and Jackson arrived at a residence which had obviously just been burglarized and from which a television set had been removed. The owner of the house subsequently identified the television, the parka and the translator as his.

Subsequent to the hearing, the court granted that branch of defendant's motion which sought suppression of the two watches, the chain and the screwdriver found upon his person inasmuch as the personal search had been made incidental to an illegal arrest. The court, however, denied so much of defendant's motion as sought suppression of the television, the jacket and the translator, finding "no nexus between the illegal arrest and the items observed in plain view".

Following a trial, the jury returned a verdict finding defendant guilty of burglary in the third degree. He was sentenced as a second felony offender to an indeterminate term of imprisonment of three and one-half to seven years.

Defendant contends that he was subject to an unlawful arrest since the information received by the State Police in the form of the two telephone calls did not rise to the standard of probable cause to arrest. Moreover, he asserts that his statements regarding ownership of the television set did not raise the quantity of information to the level of probable cause to arrest. Consequently, he argues, all of the evidence seized from the vehicle should have been suppressed.

The People's counterargument is three pronged: (1) defendant lacks standing to challenge the search; (2) at the time the property was discovered, it was in plain view; and (3) the police learned of the commission of the burglary without relying upon any evidence provided by defendant.

I conclude, based on these facts, that the judgment of conviction should be affirmed.

It is well settled that in order for a defendant to have standing to challenge the legality of a search and seizure, that defendant must demonstrate a reasonable expectation of privacy in the area searched (*United States v Salvucci,* 448 US 83, 85; *Rawlings v Kentucky,* 448 US 98, 104-106; *Rakas v Illinois,* 439 US 128, 148-149, reh den 439 US 1122; *People v Ponder,* 54 NY2d 160, 166; *People v Henley,* 53 NY2d 403, 407-408; *People v Butler,* 90 AD2d 797, 798, app dsmd 58 NY2d 1056; *People v McCloud,* 81 AD2d 645, 646). Assuming, *arguendo,* that defendant was the rightful owner of the vehicle in which he and Jackson were riding when accosted by the State police and thus

had a reasonable expectation of privacy, the subject articles of personal property were in plain view. Where a defendant places his property in plain view, he could no longer claim an expectation of privacy notwithstanding his ownership of it (*Rawlings v Kentucky, supra,* p· 106). Moreover, said objects were observed during the course of a legitimate vehicle and traffic stop and were the subject of conflicting claims of ownership by defendant.

The most common type of situation in which a stop on the street for investigative purposes occurs is where the stop occurs as part of general police patrol activity and is directed, in the main, to crime prevention and to the termination of criminal activity in its early stages. This practice of field interrogation is viewed by police administrators as an important aspect of the work of officers assigned to foot and vehicular patrols (3 La Fave, Search and Seizure, § 9.3, pp 69, 82). "Consequently unrealistic restrictions on the authority to approach individuals would hamper the police" in the performance of their function (*People v De Bour,* 40 NY2d 210, 218).

It has been held that "[w]henever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment" (*People v Cantor,* 36 NY2d 106, 111). In evaluating the propriety of the police action, the crucial inquiry is whether or not such action was justified in its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible (*People v De Bour, supra,* p 222; *People v Cantor, supra*). The intensity of the police intrusion which is justifiable is directly proportionate to the severity of the precipitating circumstances. For a police intrusion to be permissible, it must be predicated on constitutionally cognizable factors (*People v Evans,* 43 NY2d 160, 164). A police officer who entertains a reasonable suspicion that a particular person has committed or is committing a crime or is about to engage in conduct in violation of the law, is authorized to make a forcible stop and detention of that person (*People v De Bour, supra,* p 223; CPL 140.50, subd 1; *People v Rosario,* 94 AD2d 329, 332). Reasonable suspicion has been defined as "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" (*People v Cantor, supra,* pp 112-113).

In the instant case, the record is not barren of objective evidence evincing criminal activity. The fact that the vehicle in which defendant was a passenger was proceeding at an excessive rate of speed, irrespective of the fact that the police were not

at first able to positively ascertain the license plate number of that vehicle, justified the stop (see *People v Ingle,* 36 NY2d 413). Once the license number became visible, the police were able to identify the vehicle as the "suspicious vehicle" which had been the subject of the radio broadcast. In view of the similar nature of the two complaints pertaining to the highly suspicious behavior of the occupants of that vehicle, the police had a reasonable suspicion that criminal activity was afoot. Having lawfully stopped defendant for inquiry (see *People v Cook,* 85 AD2d 672, 673; *People v Finlayson,* 76 AD2d 670, cert den 450 US 931) the police then observed a television set, a parka and a translator in plain view (see *People v Landy,* 59 NY2d 369, 376). Defendant thereafter made two conflicting statements concerning ownership of the television. Without passing upon the question of whether the ensuing arrest of defendant was based upon probable cause, we note that the discovery of the television set, the parka and the translator was totally independent of the arrest. Accordingly, it cannot be argued that this evidence constituted the fruit of an illegal detention (see *People v Rogers,* 52 NY2d 527, 533, mot for lv to rearg den 54 NY2d 753, cert den 454 US 898). Suppression of these items was properly denied (cf. *Dunaway v New York,* 442 US 200). "[I]t neither serves the interests of society nor advances constitutional values for our courts to strive for ways to permit criminals to go free in the absence of evidence that the police have, in fact, engaged in any misconduct" (*People v Finlayson, supra,* p 682).

I have considered defendant's remaining contention and find it to be without merit.