■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES EVANS, Appellant. — Appeal by defendant from a judgment of the County Court, Suffolk County (Kitson, J.), rendered September 8, 1982, convicting him of two counts of criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Judgment affirmed.

In March, 1982, the New York City police were involved in a drug investigation of one Robert Wise. During the course of this investigation, the police were informed by a confidential informant of "a contract" that had been offered to kill one Rory Schonhaut, who resided at 19 Munson Street, Medford, in Suffolk County. The confidential informant, who had assisted the New York City police in at least a half dozen prior investigations, knew about the contract on Schonhaut's life because it had been offered to him. If the confidential informant did not execute the contract within one week's time, it was to be offered to two other individuals. By the time the confidential informant relayed this information to the New York City police, the one-week time period was due to expire.

In the early morning of March 20, 1982, approximately eight plainclothes New York City police officers, who were armed with shotguns and each of whom was wearing a bullet-proof vest, drove out to Suffolk County and met with two Suffolk County police officers, Sergeant Billelo and Police Officer Bless. At that time, the New York City officers, accompanied by Officer Bless and Sergeant Billelo, went to 19 Munson Street in Medford to notify Schonhaut that there was a contract out on his life. Apparently, after speaking with the officers, Schonhaut refused police protection.

After the New York City police officers left the scene, Sergeant Billelo advised Officer Bless that according to the New York City officers, the subject, Schonhaut, was into narcotics and possibly guns. With this information in mind, Officer Bless

placed a notification in his vehicle, car 504, as well as in the vehicle for the neighboring sector, car 502, which read: "Number 19 Munson, off Rustic in Medford. Never go alone. Have backup. Male 26 year old subject resides there, into guns and deals drugs. 3/20/82 at 015 hours. New York P.D. sent eight detectives with vests and shotguns just to talk to him. Unit 504".

On March 22, 1982, at approximately 4:51 P.M., Officer Salinari of the Brooklyn South Narcotics Division telephoned the duty officer at the Suffolk County Police Department Communications Bureau to inform him that there was a contract out on the life of Schonhaut who resided at 19 Munson Street and to be sure that the police cover any complaints in that area expeditiously. The desk sergeant subsequently relayed this information to Police Officer Pipe of sector 504, which covered the area of 19 Munson Street.

At approximately 9:30 P.M., that same evening, Neil Bass, Schonhaut's brother-in-law, who also resided at 19 Munson Street, was sitting in his upstairs bedroom when he heard a car with a loud muffler drive by the house. When Bass looked out the window, he observed a grey or blue Cadillac with two occupants driving slowly by the house. The Cadillac circled the house approximately six times during a one-hour period. Thereafter, the vehicle parked by a neighbor's house and Bass observed a black male walking alongside his neighbor's chain-link fence and heading towards the driveway of 19 Munson Street. Bass, knowing of the purported contract on his brother-in-law's life, told his mother-in-law to call the police.

At approximately 10:50 P.M., Officer Cuccio of car 502 received a radio call to respond to 19 Munson Street to investigate a prowler complaint. Officer Cuccio, having read the note left by Officer Bless two days previously regarding that premises, requested assistance. Thereafter, Officer Pipe of car 504 and Officers Peppler and Amato of car 527 were directed to respond to the location. While en route to the premises, Officer Pipe informed the other two units via radio of the contract on the life of Schonhaut who resided there.

Officer Cuccio was the first officer on the scene. When he drove up to the premises, Schonhaut and Bass came running over to the patrol car. As Bass was telling Officer Cuccio about the vehicle which had been driving past the house during the evening and the black male who had been seen walking toward his driveway, he suddenly said "[t]here goes the car that was passing the house several times tonight" and pointed behind the officer. Officer Cuccio, who was still seated in the patrol car, turned around, and saw a vehicle, which appeared to be a

Cadillac, proceeding slowly down Forte Avenue about 100 to 125 feet away. Officer Cuccio immediately radioed to the other responding units and directed them to stop the vehicle.

In the meantime, Officers Peppler and Amato had been driving down Forte Avenue towards Munson Street when they observed a Cadillac, which had been parked at the curb, pull out directly in front of them. The Cadillac was proceeding at an unusually slow speed and the officers, in an effort to pass it, pulled up alongside the Cadillac. At that point, Officer Peppler looked over at the driver of the vehicle, the defendant herein, and noticed that he was acting suspiciously. Officer Peppler explained that the defendant was "looking straight ahead"; "he wasn't curious to see what was going on. His head didn't move". Officer Peppler also noticed that there was a passenger in the car. The officers continued to follow the Cadillac and, within a few minutes, they received a radio call from Officer Cuccio to stop it. Officer Peppler advised headquarters that they were directly behind the subject vehicle and eventually pulled it over.

Once the Cadillac had stopped, the defendant alighted from it and started to walk back towards the police vehicle. Officer Amato ordered the defendant to stop where he was, exited his car and approached the defendant. Meanwhile, Officer Peppler shined the patrol car's spotlight on the Cadillac in order to observe the movements of the passenger. Officer Peppler, who felt that he was in danger, got out of the patrol car with his revolver drawn. At that point the patrol car's spotlight malfunctioned and went out. Officer Peppler then went over to the subject vehicle and ordered the passenger out of the car. As the passenger exited the vehicle, Officer Peppler observed a heavy metal chain and padlock draped around the brake pedal of the car. He also noticed a brown leather bag on the floor in front of the passenger seat. The bag was open and Officer Peppler could see a ski mask and several bullets wrapped in a piece of styrofoam with tape on it.

As Officer Peppler was ordering the passenger out of the vehicle, Officer Pipe, who had responded to the scene in the meantime, was standing by the open driver's door of the Cadillac. The interior car light was on and Officer Pipe observed a heavy chain on the brake pedal. At first glance, the officer thought the chain might be a weapon. He then squatted down and put his head into the vehicle in order to get a better look at the chain. As he turned his head to the left, Officer Pipe observed a barrel of a gun sticking out from under the driver's seat. He retrieved the gun, a .44 caliber revolver, from under the seat, looked into the chambers and found several bullets in the cylinder. He then placed the gun on the driver's seat.

The defendant was frisked and the officers found a large folding knife and a pair of brass knuckles in his pockets. The defendant and the passenger were subsequently arrested and transported to the precinct. The Cadillac was impounded and brought to the precinct.

Thereafter the contents of the car were examined and the officers found a loaded .38 caliber, two-inch-barrel revolver under the passenger seat. The brown leather bag inside the vehicle was also examined and the following items were discovered: a pair of handcuffs, eleven .44 caliber magnum bullets in a styrofoam sleeve, one black leather holster, one ski mask and a pair of surgical gloves. The defendant was searched upon his arrival at the precinct and three rounds of .44 caliber ammunition were found in his pants pockets. The passenger of the vehicle was also searched and the officers found a key which fit the handcuffs that were contained in the brown leather bag and several .38 caliber bullets.

The defendant moved to suppress the physical evidence seized as an incident to his arrest and as the result of the search of the vehicle. The County Court denied the motion. We agree.

In the first instance, we disagree with the defendant's contention that the prosecution failed to establish the reliability and credibility of the confidential informant who told the authorities of the contract to kill Schonhaut. Where, as in the case at bar, the prosecution seeks to demonstrate only that the police had a reasonable suspicion that criminal activity was afoot, thereby justifying a stop, "it [is] essential that at least some showing be made of the basis of the informant's knowledge" (*People v Earley,* 76 AD2d 335, 341; cf. *People v La Pene,* 40 NY2d 210, 224-225). A review of the testimony in this case clearly indicates that such a showing was made. Officer Salinari testified that the confidential informant in question had assisted him in at least a half dozen prior investigations and that the information provided by the informant led to arrests and convictions in those cases. In addition, according to the officer's testimony, the informant had personal knowledge of the alleged criminal activity since he was originally offered the contract to kill Schonhaut.

Next we find that in view of the information provided by the confidential informant which was relayed to the Suffolk County police by the New York City police, and in view of the facts known to Officer Cuccio upon responding to 19 Munson Street, the officer clearly had reasonable suspicion to believe that the occupants of the Cadillac, which was driving away from the scene, were involved in criminal activity. Thus Officer Cuccio was justified in ordering the responding units to stop the Cadillac. The facts of this case are similar to those presented in

(*People v Rosario* 94 AD2d 329). In *Rosario,* the police received a call at approximately 4:30 A.M. concerning a burglary in progess at a florist shop. Upon arriving at the scene in a marked patrol car, the officers observed, from a distance of about a half block away, a car without its lights on pull out of a closed gas station at a high rate of speed. The officers pursued the vehicle and pulled it over. In *Rosario,* this court found that the officers clearly had reasonable suspicion to justify the stop of the vehicle. In the case at bar, Officer Cuccio had even more reason to suspect that the Cadillac was involved in criminal activity since one of the complainants pointed the car out to the officer and identified it.

Upon receiving the radio call from their fellow officer to stop the Cadillac, Officers Amato and Peppler acted properly in pulling the vehicle over. Moreover, once the vehicle was stopped, the officers were justified in approaching its occupants with guns drawn since they clearly had reason to believe that the occupants were armed and dangerous (*People v Finlayson,* 76 AD2d 670, 678, application for lv to app den 51 NY2d 1011, cert den 450 US 931; *People v Rosario, supra; People v Gray,* 90 AD2d 405, 408). For these same reasons, the officers were justified in ordering the passenger out of the car (*Pennsylvania v Mimms,* 434 US 106).

In addition, we find that the gun discovered under the driver's seat of the car, which resulted in the defendant's subsequent arrest, was properly seized and thus not subject to suppression. In the first instance, it is noted that in *Michigan v Long* (463 US 1032, 103 S Ct 3469), the United States Supreme Court held that where an officer stops a vehicle based upon reasonable suspicion, and the officer has reason to believe the occupants thereof are dangerous, he is entitled to conduct a search of the interior of the passenger compartment of the vehicle in order to uncover any weapons. Therein, the Supreme Court stated that the fact that the potentially dangerous individual is outside of the vehicle when the area search is conducted does not require a different result since if the suspect is not placed under arrest, he would be permitted to re-enter his vehicle and he would then have access to any weapons inside (*Michigan v Long, supra,* p —, p 3481). In view of the circumstances of this case, it is clear that the discovery of the loaded weapon under the driver's seat can be justified under an area search analysis. In any event, we also find that the seizure of the weapon falls within the purview of the plain view doctrine which applies when the evidence seized is observed inadvertently by an officer positioned where he is entitled to be (*Coolidge v New Hampshire,* 403 US 443, 466;

*People v Earley,* 76 AD2d 335, 341, *supra).* Herein, Officer Pipe was standing by the open driver's door of the vehicle when he observed a heavy chain and padlock down near the brake pedal. As he squatted down to look at the chain which he believed might possibly be a weapon, he saw the barrel of the gun protruding from underneath the seat. Clearly, the weapon was in plain view and properly seized.

Turning, to the defendant's other arguments, we find that the trial court's charge to the jury with respect to the presumption of intent under subdivision 4 of section 265.15 of the Penal Law was not improper and did not shift the burden of proof on the issue of intent from the prosecution to the defendant. Moreover, it is noted that no exception was taken to the charge at trial and thus the alleged error was not preserved for appellate review (see CPL 470.05, subd 2; see, also, *People v Thomas,* 50 NY2d 467). We also reject the defendant's contention that he could not be convicted, as a matter of law, of criminal possession of a weapon in the second degree since there was no evidence in the record of any underlying crime or unlawful use of the weapon. The question of whether the defendant intended to use the weapons unlawfully against another (Penal Law, § 265.03) was for the jury to decide in view of the circumstances of the case. Moreover, the statutory presumption of intent (Penal Law, § 265.15, subd 4) allowed the jury, if it so desired, to infer such intent. A review of the record and facts of this case clearly supports the jury's finding of intent and thus will not be disturbed on appeal. Parenthetically, we note that there is no statutory or case law support for the defendant's position that the proof of intent must be such that another crime should be charged along with criminal possession of a weapon in the second degree. Intent is just one element of a second crime. Thus in many cases, such as the one at bar, there may be sufficient evidence to prove the intent to use the weapon unlawfully but not enough evidence to prove a second crime.

Finally we conclude that the sentence imposed upon defendant of an indeterminate term of imprisonment of 4 to 12 years upon each count of criminal possession of a weapon in the second degree, to run concurrently, was not excessive and thus a downward modification of the sentence is not warranted.

We have reviewed the defendant's other contentions and find them to be without merit. Thompson, J. P., O'Connor, Niehoff and Boyers, JJ., concur.