■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LOUIS VASQUEZ, Appellant. — Judgment of the Supreme Court, New York County (S. Katz, J.), rendered April 26, 1983, convicting defendant, upon his plea of guilty, of two counts of criminal possession of a weapon in the third degree, and sentencing him to five years' probation, is affirmed.

On September 28, 1981, police officers on radio motor patrol in upper Manhattan noticed an automobile which was being driven by defendant, with a New Jersey license plate attached only by a string. One of the police officers, Herlihy, testified that this mode of license attachment was frequently used on stolen cars. In addition to the driver, there was one passenger sharing the front seat. The police made a U-turn to follow the car.

Meanwhile, defendant had double-parked and exited the vehicle when the police approached him and asked to see his driver's license and registration. Defendant handed Officer Herlihy a New York driver's license in the name of Louis Vasquez, with a Manhattan address. He also gave the officer a New Jersey registration which matched the license plates, in the name of Conrad Pons, with a Union City, New Jersey, address for that individual. Officer Herlihy then asked the defendant driver who the owner of the car was. Defendant replied that he, himself, was the owner, i.e., Conrad Pons with a New Jersey address, although he was driving with an operator's license as Louis Vasquez, with an address in New York. The officer then went over to the passenger still sitting in the car and asked *him* who owned the car. The passenger replied that he did not speak English. The officer leaned into the open window and asked again if the passenger knew who owned the car. As he did so, he saw a metal object which appeared to be a pistol on the floor between the passenger's legs. Officer Herlihy opened the door, reached in and pulled out a loaded automatic pistol. After the defendant and the passenger had been arrested, an inventory search of the automobile revealed the presence of another loaded automatic pistol.

Defendant was indicted along with his passenger on two counts of criminal possession of a weapon in the third degree. After hearing, the court denied defendant's motion to suppress the seized weapons. Defendant pleaded guilty to both counts of the indictment and was sentenced as noted above.

Defendant, and the dissent, contend that the hearing court should have suppressed both guns as the product of an illegal search and seizure. We disagree. We also disagree with the dissent's conclusion that Officer Herlihy violated the rights of the owner and driver of the car by an "intrusion * * * [consisting] of a search of the interior of the vehicle, albeit visual."

The dissent concedes that the police stop of the vehicle and the requirement that defendant produce his driver's license and the auto registration was proper in light of the dangling New Jersey license plate. Moreover, the dissent also acknowledges that further inquiry was appropriate in view of the discrepancy between the names on the license and registration (as mentioned *supra,* there were also different addresses, in two separate States), including the right to make inquiry of the passenger as to his knowledge of the ownership of the vehicle.

Much of the testimony of Officer Herlihy is set out at length in the dissent and hence need not be repeated. However, examination of some of that testimony, in context, is instructive. Thus, although Officer Herlihy testified he "leaned into the car" and spoke to the passenger and again got a negative answer, he continues "and I looked around the car and I saw something on the floor of the car." On cross-examination, Officer Herlihy gave his reason for leaning into the *open* car window when he questioned the passenger. Defense counsel then asked whether the officer leaned into the car and asked the passenger a second time who was the owner of the car. After the officer responded "yes" the counsel asked "What you feel he couldn't hear you?" and was answered "Well, sometimes, yes, maybe he didn't." Counsel then asked in obvious sarcasm, "Maybe your English would be a little clearer if you leaned into the car?" and the officer responded "Possibly he might have picked up some omre [*sic* — more] words or something." Thus, the testimony showed that the officer leaned into the car simply in an attempt to better have himself understood by the passenger. When he did so, he certainly was not obligated to place his hands over his eyes or not view what was in plain sight.

The case of *People v David L.* (56 NY2d 698, revg on dissent of Hopkins, J. P., and Weinstein, J., 81 AD2d 893) is directly in point. The dissent herein notes that in *David L.* the Appellate Division dissenters, whose opinion was adopted by the Court of Appeals, ruled that the passenger had no possessory rights in the car while in this case we deal with the rights of the owner and driver. However, in *David L.,* the dissenters gave this lack of a possessory right by the passenger only as an *additional* reason for affirming the conviction (*People v David L.,* 81 AD2d 893, 896, *supra*). The main thrust of their decision was that the

police had the right to open the door of a car, lawfully stopped by them, to decrease the risk of injury to them.

The defendant and the dissent herein rely upon *People v Vidal* (71 AD2d 962) to support the conclusion that since there was no evidence of any danger to the police, the act of leaning inside and conducting a visual search was without justification.

However, the Court of Appeals in adopting the dissent in the *David L.* case has, in effect, reversed the decision in *Vidal* (*supra*). True, in *David L.* (*supra,* p 893), the Appellate Division majority, expressly relying upon *Vidal*, held that although an officer who lawfully stops a driver for a traffic offense may order the driver to step out of the car, the officer *may not, in the absence of any independent evidence of criminality or danger to himself,* take the additional step of opening the doors of the vehicle to look inside. The dissent adopted by the Court of Appeals, rejecting this reasoning, stated in pertinent part (p 895): "The narrow question before us is whether a police officer may open the door to a motor vehicle during the course of an investigation following the legal stop of the vehicle for good cause — here a defective tail light and excessive noise. We think that to hold the police may not so behave, under the circumstances here, imposes an unreasonable and unduly onerous burden on the legitimate activities of law enforcement agents * * * In determining the unreasonableness of a search and seizure the total circumstances must be considered. Here the defendant was seated in an automobile lawfully stopped by the police while it was proceeding on a public highway. The United States Supreme Court has lately recognized the inordinate danger to a police officer as he approaches a person seated in an automobile (*Pennsylvania v Mimms,* 434 US 106, 110). The statistics of police homicides indicate, as the Supreme Court pointed out in *Mimms,* that (p 110) ' "a significant percentage of murders of police officers occurs when the officers are making traffic stops" ' (*People v Troiano,* 35 NY2d 476, 478, 482 [concurring opn by Rabin, J.]). The opening of the door of the car lessens to a substantial degree the risk of injury to the officer from the use of a gun by a passenger. It cannot be said, therefore, that the 'search', i.e., the mere opening of the door, was unreasonable."

It is now settled New York law that a valid investigative stop of a car may be accompanied, as a protective measure, by the opening of the door and a directive from the police to the occupants to exit the car (see *People v Rosario,* 94 AD2d 329).

The actions of Officer Herlihy herein were much less intrusive. He did not open the door of the automobile, nor was his purpose, according to the testimony, to make a search. Even if

we assume, *arguendo,* that he did in fact lean in the car window solely to make a visual search, he had every right to do so since he had the right to open the car door and order the passenger out (*People v David L., supra; People v Rosario, supra*). The statement in the dissent which relies on the ground that there was no evidence that the officer was in danger misses the mark. The record does not show any question put to the officer either by the People or defense counsel as to whether he "felt" himself to be in danger. The courts have held, and rightly so, that *every* stop of an automobile may pose potential danger, as an objective matter, to a police officer, regardless of how he may perceive the situation (see *Pennsylvania v Mimms,* 434 US 106, 110, *supra; People v David L., supra; People v Livigni,* 88 AD2d 386, affd 58 NY2d 894; *People v Rosario, supra*). Therefore, for Officer Herlihy to "lean" into the car window as he spoke to the passenger and more closely observe the passenger, his movements and immediate surrounding, was, even accepting the dissent's interpretation of the officer's actions, a reasonable precautionary step on the officer's part. It was also much less intrusive than ordering the door opened and the passenger to step out, as the officer had every right to do, without any overt act on the part of the driver or passenger or specific fear on the part of the officer (*People v David L., supra; Pennsylvania v Mimms, supra*).

*Commonwealth v Podgurski* (386 Mass 385, 436 NE2d 150, cert den 459 US 1222), cited by defendant and the dissent, is inapposite. There, evidence was suppressed where a police officer thrust his head into the open side door of a van, enabling him to observe areas not visible from the outside. The Massachusetts court had delineated areas of a vehicle in which there is a legitimate expectation of privacy, noting those areas are free from observation except by "physical intrusion" of some sort and typically include the glove compartment, trunk, closed containers in the interior and other areas not in plain view (386 Mass, at p __, 436 NE2d, at p 153). The court included the back of a "windowless van" in this category. In the instant case, however, the firearm was observed on the front-seat floor, an area in plain view from the outside of the vehicle. In addition, in *Podgurski,* the court noted that the officer had not observed any improper activity *until* he stuck his head inside the van and made it clear that had he observed any suspicious activity, he would have been entitled to look inside the van (386 Mass, at p __, 436 NE2d, at p 152). In the instant case, Officer Herlihy observed the license plate hanging by a string and the defendant's driver's license and the auto registration made out to different persons at different addresses, while defendant claimed he was the owner of the vehicle. In view of this suspicious behavior, the

police would have been justified in stopping the vehicle, ordering the occupants out and opening the car doors, in which case the gun on the floor of the front seat would have been in plain view. But they did not go so far. Under the circumstances here presented, leaning in an open window to speak to the passenger and observing the gun in plain view was far less intrusive and hence not violative of defendant's rights.

As the Court of Appeals has recently stated: "One has no legitimate expectation of privacy in locations in a car which are observable by passersby. Accordingly, an officer's *simply peering inside an automobile* does not constitute a search and the Fourth Amendment consequently does not limit this activity [citations omitted]" (*People v Class,* 63 NY2d 491, 494-495; emphasis added). Concur — Kupferman, Asch and Silverman, JJ.

Murphy, P. J., and Fein, J., dissent in a memorandum by Fein, J., as follows: Defendant appeals from a judgment, Supreme Court, New York County (Katz, J.), rendered April 26, 1983, convicting him, upon his guilty plea, of two counts of criminal possession of a weapon in the third degree, and sentencing him to five years' probation. The appeal brings up for review the denial after a hearing of the defendant's motion to suppress.

The judgment should be reversed, on the law, the motion granted, the indictment dismissed and the case remanded to Criminal Term for the purpose of entry of an order in its discretion, pursuant to CPL 160.50.

On the morning of September 28, 1981, Police Officers Gorman and Herlihy, while on patrol in a radio car in Manhattan, observed a vehicle with New Jersey license plates traveling south on Broadway near 183rd Street. The front license plate was affixed to the car with a rope. The officers made a U-turn and followed the car, which by then had double-parked. Defendant driver emerged from the vehicle and walked toward the sidewalk, while the passenger, codefendant Cabollaro, remained inside. Officer Herlihy approached the defendant and asked to see his driver's license and car registration. Defendant produced a New York driver's license in the name of Louis Vasquez and a New Jersey registration for the vehicle, which identified the owner as Conrad Pons. The registration displayed to the officer matched the license plate on the car.

The officer was questioned concerning any inquiry he made to the driver.

"Q: Now, did you have any conversation with the defendant with respect to his — the driver's license and registration card you [*sic*] displayed?

"A: I did, sir. Yes.

"Q: What was that?

"A: I asked him who the owner of the car was.

"Q: Did he reply?

"A: If I recall, he said he was the owner.

"Q: Now, what did you do next?

"A: I — then I walked a little further up to the passenger car and I spoke to the passenger."

On cross-examination, the officer testified as follows:

"A: I asked him for his license and registration.

"Q: You said nothing before that?

"A: I don't recall, sir.

"Q: And at that time where was he standing?

"A: Well, just at the sidewalk, just on the sidewalk * * *

"Q: And he gave you a license and registration?

"A: Yes, sir.

"Q: Now, when he gave you this license and registration you saw a different name on the registration and a different name on the license; is that correct?

"A: Yes, sir * * *

"Q: All right. At that time when you saw this different license and registration did you go over to your police car to see if the car was on the stolen list?

"A: No, sir * * * "Q: Now, you asked the driver who owned the car; is that correct?

"A: Yeah.

"Q: And he said he did?

"A: Yes.

"Q: And you didn't go over to your rmp to check to see if it was on the stolen list?

"A: Yes.

"Q: You then went to the car to ask the passenger who owned the car?

"A: Yes."

The officer had previously testified on direct:

"A: I — then I walked a little further up to the passenger car and I spoke to the passenger.

"Q: Now, when you spoke to the passenger, what if anything did you say to the passenger in the car?

"A: I believe it was, 'who is the owner of the car?' I asked him in substance who owned the car, who is the owner of the car?

"Q: And was there a response?

"A: Yes. He told me he didn't speak any English. In other words, he didn't understand what I had asked him.

"Q: All right. And what happened next?

"A: I leaned into the car and I spoke to him again and again I got a negative answer, 'No speak English' and I looked around the car and I saw something on the floor of the car.

"Q: All right. What was it that you saw on the floor of the car?

"A: It was a metal object, appeared to be a pistol."

The officer further testified that he then opened the car door, reached in and pulled out the object, which turned out to be a pistol.

The officer's testimony on cross-examination is consistent in this respect with his testimony on direct. Thus, he pursued no further inquiry respecting the difference in names between the New York driver's license and the New Jersey registration, albeit the defendant advised him (which turned out to be the truth) that he used both names, the name Vasquez being his mother's maiden name.

It is plain that the officer made no real effort to ascertain whether the driver and owner were the same person or whether the vehicle had been stolen. There was no check on any stolen vehicle list in the rmp, no inquiry in the usual manner of the precinct as to whether the vehicle had been reported as stolen. His sole action in this respect was to go to the door of the car and inquire of the passenger as to the car's ownership. At the same time he leaned into the car and made an eye search, which revealed the presence of the gun.

Assuming the credibility of the officer's testimony that he went to the car door to inquire of the passenger as to the ownership of the vehicle, the officer concededly did more. He "leaned into the car and * * * looked around the car and * * * saw something on the floor of the car." The "something" turned out to be a gun. This was a search which was unreasonable. The act of leaning inside and conducting a visual search of the interior of the car was without lawful justification. There was no evidence of any danger to the police officers, nor was any such claim made to justify such intrusion (*People v Vidal,* 71 AD2d 962). As the officer admitted, this kind of inquiry of the passenger as to the car's ownership was not a usual procedure.

The police stop of the vehicle and the requirement that the driver produce his license to drive and the registration as to ownership of the vehicle were perfectly proper in the light of the dangling New Jersey license plate attached only by a rope

(*Delaware v Prouse,* 440 US 648, 653; *People v Ingle,* 36 NY2d 413, 420). Moreover, further inquiry was appropriate in view of the discrepancy between the names on the driver's license and the registration, including, perhaps, the right to make an innocuous inquiry of the passenger as to his knowledge of the ownership of the vehicle.

The relevance or function of the inquiry of the passenger does not appear. Nowhere in the record is it suggested that the officer would have felt bound or satisfied if the passenger responded that Vasquez was indeed the owner of the vehicle. Nor would an answer that Vasquez was not the owner be determinative. In short, any answer by the passenger would not be dispositive.

Even assuming that the inquiry was appropriate and would serve a useful purpose, this did not include the right to make a search of the vehicle, which, in effect, occurred when Officer Herlihy, in conjunction with his questioning of the passenger, "leaned into the car and * * * looked around", thus bringing into view the metal object beneath the passenger's feet.

It cannot be gainsaid that an officer has the right, when he approaches an individual seated in an automobile, to take such steps as appear necessary to protect himself against possible danger, even to the extent of opening the car door and asking the driver to get out (*Pennsylvania v Mimms,* 434 US 106; *People v David L.,* 56 NY2d 698). However, there is no evidence in this case and no claim is asserted that the officer was in any danger, or felt himself to be in danger.

Instructive is *People v Class* (63 NY2d 491), where the police officer checking for the vehicle identification number (VIN) reached into the stopped car and moved papers on the dashboard to enable him to view the VIN. In so doing, he saw the handle of a gun protruding from underneath the seat. He seized it and then arrested the defendant driver who had previously emerged from the vehicle at the officer's instructions.

As stated by the Court of Appeals (pp 494-495): "The Fourth Amendment 'protects people from unreasonable government intrusions into their legitimate expectations of privacy (*United States v Chadwick,* 433 US 1, 7; see, also, *Katz v United States,* 389 US 347; *People v Perel,* 34 NY2d 462, 466). One has no legitimate expectation of privacy in locations in a car which are observable by passersby. Accordingly, an officer's simply peering inside an automobile does not constitute a search and the Fourth Amendment consequently does not limit this activity (*Texas v Brown,* 460 US 730; *People v Cruz,* 34 NY2d 362, 370). But there are many places inside a car — including the area underneath the seats — which cannot be viewed from the

outside and which an individual legitimately expects will remain private. The government intrusion here, Officer McNamee's opening the door and reaching inside, was undertaken to obtain information and it exposed these hidden areas. It therefore constituted a search (cf. *United States v Place,* 462 US 696; *People v Miller,* 43 NY2d 789, affg 52 AD2d 425, 428; *People v Sullivan,* 29 NY2d 69)."

As *Class (supra)* notes, section 401 of the Vehicle and Traffic Law authorizes an officer to demand information necessary to identify the car, including a demand for the certificate of registration for the vehicle, something different than putting his head inside the car and making a visual search as in *Class* and in our case. The fact that in *Class* the officer looked inside the vehicle to check the VIN and that in our case the officer looked around while he was questioning the passenger does not alter the fact that in each case there was a search without probable cause. As noted in *Class (supra,* p 496): "The facts reveal no basis for the officer to suspect other criminal activity or to act to protect his own safety (compare *People v David L.,* 56 NY2d 698, cert den 459 US 866). The sole predicate for the officer's action here was defendant's commission of an ordinary traffic infraction, an offense which, standing alone, did not justify the search (cf. *People v Marsh,* 20 NY2d 98)."

In each case the level of intrusion depends upon the circumstances which provide the predicate for the intrusion. Thus, in *Mimms (supra),* relied upon by the majority, the automobile was being operated with expired license plates. It was stopped by the police for issuance of a traffic summons. The driver was ordered to step out and requested to produce the ownership card and operator's license. It was while the driver was stepping out of the vehicle that the police noticed the bulge which caused them to frisk the driver, revealing a .38 caliber revolver. Thus, *Mimms* dealt only with the driver and passed only on the right of the police to order the driver out of the vehicle while they were conducting their inquiry as to the ownership of the vehicle and existence of a driver's license. This has nothing to do with a search of the interior of the vehicle, nor does it speak to the alleged right, asserted by the majority, to order a passenger out of the vehicle where the basis of the inquiry is solely the right of the driver to operate the vehicle. As *Mimms* emphasizes, in each case the level of intrusion must be measured by the circumstances which provide a basis for the intrusion. The test is reasonableness. There was no search of the vehicle, visual or otherwise, in *Mimms.* Moreover, in our case the driver was already voluntarily out of the vehicle.

The intrusion here consisted, in effect, of a search of the interior of the vehicle, albeit visual. Under the circumstances, the search violated the rights of the owner and driver of the vehicle.

We are not concerned with the rights of Cabollaro, the passenger. Thus, *David L. (supra)*, relied upon by the People, is not in point. In that case, as here, the stop was found to be lawful. After the driver of the vehicle emerged to talk to the police, one of the other police officers went to the passenger side of the car and opened the door, whereupon the passenger rolled over toward the middle of the front seat causing his shirt to move up, revealing a gun in his waistband. The Appellate Division dissenters, whose opinion was adopted by the Court of Appeals, properly observed (81 AD2d 893, 896) that the passenger had "no possessory rights * * * in the car" and hence no right of privacy protecting himself against such police intrusion and that his own movement revealed the contraband.

The majority suggest that *David L. (supra)* establishes the right of the police to open the door of a car, lawfully stopped by them, to decrease the risk of injury to themselves. As we have noted, nowhere in the testimony in this case is there any suggestion that the police inquiry of the passenger related in any way to protecting the police from danger.

We are not here concerned with the right of the police to open the car door even on the passenger side in order to protect themselves against danger or injury. That was the given reason for opening the car door in *David L.,* as noted in *Class (supra)*. What followed was an observation of a gun on the person of the passenger when he rolled over as a consequence of the police opening the car door. The issue there related to the rights of the passenger. No such problem here exists.

Here, we deal with the rights of the owner and driver of the vehicle. The right of privacy and the right to be protected against unreasonable intrusion are the very essence of the Fourth Amendment. Even assuming that the officer's inquiry of the passenger as to the ownership of the vehicle was reasonable, this did not include the right to search the vehicle. The owner had a continuing and sufficient personal interest in the interior of the vehicle in which he could legitimately expect his right of privacy to be protected against unreasonable search and seizure under the Fourth Amendment (*Rakas v Illinois,* 439 US 128). The passenger's right to privacy in the vehicle was substantially less than that of the owner and driver, as *David L. (supra)* recognizes.

Nor does *People v Rosario* (94 AD2d 329) support the search made here. In that case the issue was the right of the police to require the occupants of the vehicle stopped at gunpoint to emerge from the car. However, the circumstances in *Rosario* shed no light on our problem. In that case, as stated (p 332):

"The officers received and were entitled to rely upon the radio report of a burglary in progress at the florist shop (cf. *People v Lypka*, 36 NY2d 210). Several minutes thereafter, the police reached the scene in their marked police car and observed a car, without its lights on, pull out at a high rate of speed from a closed gas station about two doors down from the florist.

"Under these circumstances, the police possessed reasonable suspicion that the car's occupants were involved in criminal activity, i.e., the burglary at the florist shop, and therefore had an adequate basis to stop the car and investigate further (see *People v Lathigee*, 84 AD2d 918)."

In that case there was no mere traffic violation, there was a burglary. Moreover, the police were able to observe, through the windows of the car, flowers and other items clearly indicative of participation in the reported burglary. No such circumstance exists here.

Equally distinguishable is *People v Livigni* (88 AD2d 386, affd 58 NY2d 894), where the officer, observing a parked car lacking a front license plate, requested the driver to produce his license and registration. At that point, from outside the car, the officer observed an empty gun holster on the front seat between the driver and the passenger, who was sitting in the front right passenger seat. The two officers then drew their guns and ordered both passenger and driver out of the car. As the passenger exited the vehicle, one of the officers noticed a gun on the front seat where the passenger had been sitting. The right to stop the vehicle was plain, in view of the missing license plate. The order to exit the vehicle was a minimal intrusion warranted by the officer's observation of the holster. The presence of the empty holster and the readily available inference that a gun was not far away gave the officers grounds to order the occupants out of the car. Plainly there was a risk involving the officers' safety which could have come from action by either the driver or the passenger.

This is a far cry from our case, where no one was ordered out of the car and the observation of the gun was only after the officer intruded into the car space and conducted a visual search.

There is no basis in the decided cases for concluding that a visual search of the interior of a car is warranted under circumstances where no danger is apparent, and where the behavior of

the passenger is innocuous and the sole evidence of criminality is the alleged violation of a traffic ordinance or regulation. This is the teaching of *Class (supra)*.

The basic principle with which we deal is the Fourth Amendment preclusion against unreasonable searches and seizures. The automobile exception, albeit necessary in the light of the mobility of such vehicles, should not be permitted to swallow the amendment in the guise of protecting the police in the absence of any evidence in the record that there was any danger to the police or that they felt themselves in any danger.

Taken at best, Officer Herlihy's intrusion into the vehicle, to pursue an inquiry which was relatively pointless, did not warrant his looking around the inside of the automobile, a search palpably unrelated to the inquiry or its purpose. The issue is not whether he should have closed his eyes. It is rather whether he should have made an unwarranted search.

In essence, the question before us is whether the officer's conduct in leaning into the vehicle and looking around the inside constituted a search, and if so, whether there was a legal predicate for such search. It is not disputed that a threshold inquiry to ascertain from the passenger the name of the owner of the vehicle was lawful. However, this does not encompass intrusion into an area where the defendant owner and driver had a legitimate expectation of privacy. Under the circumstances here involved, the defendant had a reasonable expectation of privacy with respect to the interior of the vehicle from which he had emerged.

The sole evidence of any violation of law consisted in the dangling license plate and the fact that the names on the driver's license and the registration for the vehicle produced by the driver did not coincide. If there was some evidence, not here shown, of illegal activity within the vehicle, or if, indeed, there was some evidence, not here asserted, of possible danger to the officer, the visual inspection of the interior of the vehicle might have constituted a lawful search.

It is plain that a motor vehicle is generally afforded a lesser degree of Fourth Amendment protection than is other property. However, "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." (*Coolidge v New Hampshire,* 403 US 443, 461-462.)

There is a legitimate expectation of privacy in the interior of a motor vehicle, however diminished. Such an expectation clearly exists in those areas which would otherwise be free from observation except by physical intrusion of some nature. The intrusion here involved was not supported by probable cause. The

officer's conduct here is so markedly different from that usually found where there is suspicion of a stolen vehicle that it is difficult to credit the theory that his inquiry of the passenger was solely concerned with determining the name of the owner. The officer was plainly conducting a search (*Commonwealth v Podgurski,* 386 Mass 385, cert den 459 US 1222.)

The dangling license plate may have provided an articulable basis for approaching defendant and asking to see his license and registration. However, there was no justification for leaning into the vehicle and looking around, thus conducting a visual search of its interior (*People v Class, supra; People v Vidal, supra*). As in those cases, there was no evidence or reason to believe the officer was in physical danger. (*People v Young,* 81 AD2d 843, 844, app dsmd 54 NY2d 1027.)

By putting his head inside the car door and conducting a visual search, the police officer here plainly intruded into the owner-driver's "personal security" (*Terry v Ohio,* 392 US 1, 19). There was an insufficient articulable suspicion to justify such intrusion.

There should be a reversal, the motion to suppress should be granted and the indictment dismissed.