## THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WALTER ELAM, Appellant.

First Department, April 28, 1992

---

### APPEARANCES OF COUNSEL

*Caroline Rule* of counsel *(E. Joshua Rosenkranz,* attorney), for appellant.

*Karen Swiger* of counsel *(Susan L. Valle* with her on the

brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

The issue in this case is whether the police may stop and detain a motorist on suspicion of car theft simply because he or she drives a car with a broken window. We hold that they may not.

The defendant was observed by two police officers driving a vehicle with a broken rear vent window. Believing that the broken vent might be a sign that the car had been recently stolen, the officers conducted a radio check of the car's license plates. The check, however, failed to disclose that there had been any report of the car's theft. Although their suspicions had thus far received no confirmation, the officers' belief that the car had been stolen remained unshaken. Accordingly, the officers, using flashing lights, their loudspeaker, and a horn ordered the car to pull to the side of the road. It was as a direct result of this stop that the defendant was ordered out of the car, searched and found to be in possession of a gun. He has been convicted of attempted criminal possession of a weapon in the third degree.

It is indisputable that the stop of the vehicle amounted to a seizure within the meaning of the Fourth Amendment and, accordingly, that the legality of the stop and immediately ensuing seizure of the gun may not be sustained except upon a showing that the police officers reasonably suspected that the defendant was committing, had committed or was about to commit a crime *(People v Cantor,* 36 NY2d 106, 112-113; CPL 140.50; *see also, People v Singleton,* 41 NY2d 402, 404; *People v Sobotker,* 43 NY2d 559, 563; *People v Ingle,* 36 NY2d 413, 420). In this regard, it is completely irrelevant that, as the dissent is at such pains to emphasize, the stop was "investigative". Obviously the stop was investigative, but that did not in any way reduce the predicate required to render the stop legal. By now it ought to be plain that "[t]he common-law power to inquire does not include the right to unlawfully seize. The minimum requirement for a lawful detentive stop is a founded suspicion that criminal activity is afoot" *(People v Cantor, supra,* at 114).

As the crime suspected by the officers was that of auto theft, the specific question posed is what would have reasonably

justified the officers' suspicion that the car driven by the defendant had been stolen? There is in the end but one circumstance cited by the People which would even arguably support the belief that the car had been stolen, namely, the broken or, as the dissent is at such pains to emphasize, missing rear vent window* but manifestly, that circumstance alone was not sufficient to justify the inference of auto theft. A broken car window is at least as easily suggestive of vandalism, or accident, or theft of a car's contents, as it is of theft of the car itself. Were the police to be permitted to stop every car with a broken window on suspicion of auto theft, the inevitable result would be that many, if not most of those stopped, would be innocent victims of crime or other misfortune involving window breakage who had not yet had the opportunity to repair the damage to their vehicles. Indeed, no comfort on this score can be drawn from the present case, for contrary to the officers' most stubbornly held convictions, as the radio check had indicated, the car driven by the defendant was not stolen. But, of course, even if the car had ultimately been found to have been stolen that would not demonstrate the sufficiency of the predicate upon which the police acted. Although the dissent insists on dwelling at some length upon the officers' conduct subsequent to the stop, which it finds flawless, the single relevant question in this case is whether the intrusion was justified at its inception (see, People v Cantor, supra, at 111).

Arguing, in essence, that all drivers of cars with broken windows may be routinely stopped on suspicion of auto theft, the dissent apparently finds compelling the case of People v Vasquez (106 AD2d 327, affd on different grounds 66 NY2d 968), in which the "stop" of a double-parked car with a dangling license plate was upheld. It is reasoned that if a dangling license plate may be taken as a reasonably reliable sign of crime then so may a broken window. Respectfully, it is very difficult to conceive that the fundamental right of a person to remain free of governmental intrusion amounting to seizure within the meaning of the Fourth Amendment could be made to turn upon the viability of such an analogy. It is, to say the least, a doubtful proposition that such seminal precedential significance ought to attach to the fact that, in one

---

* Presumably, the small vent window was missing because it had been broken. In any case, a photograph of the car in which the dissent places great store, shows the damage to be barely perceptible.

case, a stop, which would have been upheld anyway on the basis of the commission of a traffic violation, i.e., double-parking, was additionally permitted because a license plate was affixed in a highly unorthodox and precarious way. Certainly, the case cannot be reasonably read to signify that virtually any irregularity, no matter how common and no matter how varied its possible causes, may be viewed as sufficiently indicative of criminal activity to support a Fourth Amendment seizure.

Broken windows happen to be an unfortunately common incident of car ownership in this city. Indeed, it is doubtful whether there are more than a lucky few car owners in this jurisdiction who have not at some point had to drive to the repair shop to replace a broken pane of glass. It would surely come as a surprise and a source of considerable dismay to car owners to learn, as the dissent would hold, that they may be seized en route to the repair shop on suspicion of auto theft. Given the realities of contemporary urban life, there is a very substantial inferential gap between the sighting of a car with a broken window and the conclusion that criminal activity is at hand, and an even more substantial gap intervening before the more specific conclusion that the driver of such a vehicle is guilty of car theft. While the dissent does not trouble over the existence of such gaps, content that they are sufficiently narrowed by the "special training" of the police officers here involved on the subject of "auto crime," there has been absolutely no showing as to how the officers' "special training" would have enabled them to conclude with any degree of reliability that the defendant's car had been stolen and, of course, as it turned out, the officers' "special training" notwithstanding, the car had not been stolen, by the defendant or anyone else. Indeed, in view of the fact that the broken window proved not to be indicative of the commission of any suspected crime, it is curious that the dissent persists in the assertion that the inference of criminality was not merely permissible but was the only one to be drawn. Presumably, the case represents for the dissenter an exception to some rule that a broken car window invariably bespeaks criminality of recent vintage. But even if this view accorded with reality, the issue is not simply whether there had recently been some crime involving the car, but whether, if there had been, the defendant could be reasonably suspected of its commission. It bears repetition that "[b]efore a person may be stopped in a public place a police officer must have reasonable suspicion

that *such person* is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand." *(People v Cantor, supra,* at 112-113 [emphasis added].) Obviously, it is not an exercise of ordinary prudence or caution to believe a person guilty of auto theft simply because he or she drives a car with a broken window. In the final analysis, the officers' conviction that the defendant's car had been stolen and, what is more, that it had been stolen by him, represented nothing more than a minimally informed guess.

Perhaps in recognition of the manifest inadequacy of the broken window as the predicate for the seizure which occurred, the People urge that the police action was additionally justified by the defendant's driving, which the police described at the suppression hearing as "erratic". This description notwithstanding, there is absolutely no indication in the record that the defendant had committed any traffic violation. Indeed, the officers were quite clear in their hearing testimony that their sole reason for stopping the defendant was that they suspected him of auto theft and no explanation has been offered as to how the defendant's "erratic" driving might reasonably have been taken by the officers as indicative of his commission of that crime.

As for the dissent's rather tentative suggestion that "erratic" driving not amounting to a traffic violation may be a sufficient predicate for a stop, suffice it to say that the one case advanced in support of this dubious proposition holds nothing of the sort. Although the defendant in *People v Scanlon* (59 AD2d 788) was indeed stopped for driving in an erratic manner, the legality of the initial stop does not appear to have been litigated and, so far as can be gathered from the court's memorandum decision, was not an issue on appeal. Moreover, for all that is known, the driving described as "erratic" in *Scanlon* may well have involved actual traffic violations.

When all is said and done, it is apparent that the police officers simply had a hunch that the defendant had stolen the car he was driving. Although, as is hardly surprising, the hunch proved inaccurate, the police did manage quite fortuitously to ferret out evidence of an entirely different crime. Undoubtedly, if the police are to be permitted to pursue their vaguest intuitions of criminal activity in so aggressive a

manner, there will be instances in which some wrongdoers who might otherwise go free will be apprehended; indeed, there may be instances such as the one at bar in which completely unsuspected crimes are brought to light. The instances will be more numerous, however, in which the free rein given the police will result in baseless intrusions upon the innocent. This latter consequence of inadequately grounded police activity is unfortunately one which the judicial perspective tends to minimize, since Fourth Amendment jurisprudence has evolved almost exclusively in the context of cases in which police action, however baselessly initiated, has uncovered evidence of crime. It is, however, a consequence which must be kept scrupulously in mind, for otherwise a court in its zeal to see the guilty punished will end up by sanctioning the erosion of fundamental constitutional guarantees, the predominant and absolutely essential purpose of which is to shield innocent individuals from the arbitrary assertion of the State's formidable power.

Accordingly, the judgment of the Supreme Court, Bronx County (William C. Donnino, J.), rendered January 5, 1990, convicting the defendant upon his plea of guilty of attempted criminal possession of a weapon in the third degree and sentencing him as a mandatory persistent violent felony offender to a term of imprisonment of two years to life, should be reversed on the law, the motion to suppress evidence granted, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

Asch, J. (concurring). In the case before us, the police did not furnish justification for their belief that the automobile was stolen. Nor did they articulate any suspicion amounting to a violation of the Vehicle and Traffic Law so as to justify the stop.

The Supreme Court of the United States has expanded the right of police officers to stop automobiles (see, e.g., *Michigan Dept. of State Police v Sitz*, 496 US 444). However, even under such increasingly flexible standards, a motor vehicle may be stopped only when the police officer has an "articulable and reasonable suspicion" that a law or regulation has been

broken. *(Delaware v Prouse,* 440 US 648, 663.) New York imposes, at the least, these same standards on the police. A stop must not be "the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulate facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion' ". *(People v Ingle,* 36 NY2d 413, 420, quoting *Terry v Ohio,* 392 US 1, 21 [1968].)

Recently, the New York Court of Appeals reaffirmed the well-established principles set out in the landmark case of *People v De Bour* (40 NY2d 210). " '[T]he basic purpose of the constitutional protections against unlawful searches and seizures is to safeguard the privacy and security of each and every person against all arbitrary intrusions by government. Therefore, any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated' " *(People v Hollman,* 79 NY2d 181, 195, quoting *People v De Bour, supra,* at 217).

The law is clear that a police officer must have an "articulable and reasonable suspicion" that a motorist is involved in a violation of law before he may stop and detain that person. This was not present on the facts before us, and therefore, the police stop and detention of defendant was unjustified in its inception. Accordingly, I agree with the majority that the motion to suppress should have been granted.

SULLIVAN, J. (dissenting). On March 23, 1989, at approximately 9:30 A.M., the arresting officer, assigned with his partner to anticrime patrol, in plain clothes and an unmarked car, observed a white 1988 Nissan Stanza drive past him on West Fordham Road in the Bronx. The arresting officer noticed that the Nissan's rear passenger side vent window was "broken out" and that the rubber molding was dangling from the window. In fact, the window was missing.[1] As a trained police officer who had attended auto crime school after his training at the police academy and had made approximately 40 arrests involving stolen vehicles, he suspected from the condition of the window that the vehicle was stolen. Thus, he and his partner began to follow the Nissan. As they followed for approximately 1½ miles, the officers observed that the Nissan changed lanes "rather erratically," and was being

1. A photograph of the car which was introduced in evidence at the suppression hearing has been furnished to this court as an exhibit.

driven "pretty fast" through traffic. As they drove, the officers radioed "Central Communications" to ascertain if the vehicle had been reported stolen. "Central" informed the officers that it had not. The arresting officer nevertheless still believed that the Nissan might have been stolen but not yet officially reported and recorded as such.

The officers stopped the vehicle, and the arresting officer approached the car on the driver's side and asked defendant, the driver, to produce his license, registration and insurance card. Defendant reached under his seat and produced an insurance card and registration. Concerned because of the ease with which defendant was able to reach underneath his seat, the arresting officer, for safety reasons, requested that defendant step out of the vehicle and show him the documents at the back of the car.

At the rear of the car, defendant handed the insurance card and registration to the arresting officer, who asked for his driver's license. Defendant reached into his right front jacket pocket, leaned his upper body backwards to the right, and stepped back a foot or two from the officer. The arresting officer was startled by the quickness of defendant's movements. He also noticed a bulge in defendant's jacket pocket. Fearful that defendant might be reaching for a weapon, he grabbed defendant's pocket with defendant's hand still in it. Defendant was holding onto a hard object that, in the officer's mind, could have been a weapon. The arresting officer called for assistance. As his partner grabbed defendant's right arm, the arresting officer ordered defendant to remove his hand from his pocket. Defendant complied. The arresting officer then reached into defendant's pocket and removed a .25 caliber automatic revolver. Later, at the precinct, after twice being advised of his *Miranda* rights and agreeing to answer questions, defendant stated that he carried the gun for protection since he had recently been shot during a robbery attempt. In fact, defendant stated, his car still had bullet holes in it from the incident. When asked if he wanted the robbers arrested, defendant answered no. He refused to discuss the matter any further.

Defendant moved to suppress both the gun and his station house statements as the tainted fruit of an illegal police stop of his vehicle. After a suppression hearing at which the foregoing facts were elicited and credited, the court denied defendant's motion, finding that the Nissan's broken rear vent window and dangling rubber molding, in conjunction with

defendant's erratic and fast driving through traffic, provided the arresting officer, trained in auto crime, with reasonable suspicion to believe that defendant had recently stolen the vehicle. Thus, the court found, the stop of defendant's car was reasonable. The court also found that based on defendant's actions when stopped, the arresting officer acted reasonably in placing his hand on defendant's jacket and removing the gun from his pocket. Defendant thereafter pleaded guilty to attempted criminal possession of a weapon in the third degree in full satisfaction of the indictment and in exchange for a promised sentence, which eventually was imposed. This appeal, in which defendant raises the suppression issue, followed. I would affirm.

Tacitly conceding that once defendant was stopped the officers acted reasonably in ordering him out of the car and ultimately seizing the revolver he was carrying, both defendant and the majority challenge only the hearing court's determination that the initial stop of defendant's car was justified by reasonable suspicion. That conclusion is well supported by the record.

The arresting officer observed defendant as he passed in a car with a "broken out" rear vent window and rubber molding dangling therefrom. Specially trained in stolen cars, he knew that such a condition is an indication that the vehicle has been stolen. For that reason, he and his partner followed defendant for approximately a mile and one half as he drove "rather erratically" and "pretty fast" through traffic. During this time, the officers checked with Central Communications for a stolen vehicle report. Although the car had not been reported stolen, their suspicions were not allayed since, based on their experience and training, they knew that if the vehicle had recently been stolen, a report might not yet have been received by Central.

Thus, based upon "objective evidence" of criminality *(People v Sobotker,* 43 NY2d 559, 564)—specific articulable facts, together with the rational inferences drawn therefrom by a police officer specially trained in auto crime—and not merely, as the majority finds, a " 'hunch' " *(supra,* at 564), these officers had reasonable suspicion that defendant had been or was engaged in criminal activity, justifying a stop of the vehicle for an investigative inquiry. *(See, e.g., supra,* at 563; *People v Cantor,* 36 NY2d 106; *People v Ingle,* 36 NY2d 413.) Of course, if Central Communications had informed the officers that the car had indeed been reported stolen, they then

would have had virtually prima facie proof that defendant had committed a crime. This, however, is not the standard required for an investigative stop.

That there may be an innocent explanation for the "broken out" window and dangling rubber molding does not detract from the reasonableness of the officers' suspicion. For example, in *People v Vasquez* (106 AD2d 327, *affd* 66 NY2d 968), this court found proper the police stop of a vehicle and the requirement that the driver produce his license and registration in light of a dangling license plate attached only by a rope.[2] One of the arresting officers testified that this mode of license attachment was frequently used on stolen cars, but clearly, the inference of criminality was not the only one that could be drawn from a license plate attached in such a manner. In this case, in contrast, the inference of criminality is the only one which can reasonably be drawn from the missing car window since the absence of damage to the surrounding area makes it highly unlikely that this condition was the result of an accident. Although the officers could not have been certain that the criminal conduct—vandalism or theft of the car's contents—was committed by the driver, one could reasonably infer from the absence of any temporary covering that the criminal conduct was of recent vintage.

The hearing court also relied on defendant's erratic and fast driving through traffic. While driving erratically may not be sufficient to justify a stop on suspicion of a traffic violation, the officers did not need a traffic violation to justify their actions. They already had reasonable suspicion to stop defendant to investigate whether the car was stolen. His erratic and fast driving merely lent additional support to the officers' suspicion that defendant had committed or was committing a crime. In any event, car stops predicated on erratic driving have been upheld. *(See, e.g., People v Scanlon,* 59 AD2d 788.)

The officers' conduct, from their initial observation of defendant's vehicle until the stop, was reasonable and the stop

2. The dissenters in *Vasquez* (Murphy, P. J., and Fein, J.) concluded that while "[t]he dangling license plate may have provided an articulable basis for approaching defendant and asking to see his license and registration[,] * * * there was no justification for leaning into the vehicle and looking around" *(supra,* at 339); the dissenters did "not dispute[ ] that a threshold inquiry to ascertain from the passenger the name of the owner of the vehicle was lawful" *(supra,* at 338). The dissent thus would have granted suppression only on the ground that the officer's subsequent conduct constituted an impermissible intrusion. As noted, that is not the case here.

justified. Equally proper was their subsequent conduct, which is not challenged. Accordingly, the judgment of conviction should be affirmed.

MILONAS and ASCH, JJ., concur with MURPHY, P. J.; ASCH, J., also concurs in a separate opinion; SULLIVAN and ROSEN-BERGER, JJ., dissent in an opinion by SULLIVAN, J.

Judgment, Supreme Court, Bronx County, rendered January 5, 1990, convicting defendant upon his plea of guilty of attempted criminal possession of a weapon in the third degree and sentencing him as a mandatory persistent violent felony offender to a term of imprisonment of two years to life, reversed, on the law, the motion to suppress granted and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.