OPINION OF THE COURT
Carolyn E. Demarest, J.
The instant indictment charges these five defendants, acting in concert, of having committed crimes of robbery in the first and second degrees, grand larceny in the second degree, criminal possession of stolen property in the third degree and criminal mischief in the fourth degree on March 6, 1992, when they are alleged to have robbed a jewelry store in Brooklyn. Defendants came to be charged with this crime following their apprehension on March 6 for purportedly being in possession of a stolen vehicle and the subsequent discovery that they were in possession of some of the items stolen from the jewelry store several hours earlier. An identification procedure followed. The defendants have challenged *413 the legality of their arrest and have moved to suppress all evidence obtained as a result of that arrest, including the identifications. A Dunaway hearing was commenced on October 27, and continued to November 11 and 12.
Arresting Officer James McMullen testified that on March 6, 1992, at approximately 3:10 p.m., while on routine patrol in a marked police vehicle with his partner for that day, Officer Jacqueline Leiva, who was driving, his attention was called to the fact that the grey 1981 Toyota directly in front of the police car was missing a trunk lock and its door locks were damaged. As the police vehicle followed for several blocks, the occupants of the Toyota turned around to look back at the police car, but, according to Officer McMullen, all traffic regulations, speed limits and stop signals were observed by the driver. There was nothing in the manner in which the vehicle was operated that provoked a stop.
Suspicious that the vehicle might be stolen, however, Officer McMullen suggested to driver Leiva that she pull the police car alongside the passenger side of the Toyota, which she did at a traffic light. Officer McMullen observed, from a distance of about 10 feet, that the ignition was missing from the steering column and a fork had been placed into the ignition. Officer Leiva also testified that she specifically recalled observing the "popped out” ignition and the fork.
During the time the police car had been following the Toyota, Officer McMullen had called in the license plate number to check for a report that the Toyota was stolen. This report had come back negative. Nonetheless, Officer McMullen put out a radio transmission that the vehicle had been or was about to be stopped and several other police vehicles responded even before McMullen and Leiva actually stopped the Toyota at Sullivan and Rogers.
As Officer McMullen approached the driver and Officer Leiva approached the passenger side, one of the rear occupants, later identified as defendant Bramble, ran out of the car and was apprehended a few feet away by another officer at the scene. Officer McMullen testified on direct examination that all of the defendants were immediately placed under arrest for the "stolen vehicle”. A pillowcase with jewelry in it was purportedly recovered by a brother officer at the scene, although, because the Mapp issue was reserved, there was no testimony regarding where or how it was discovered. Back at the precinct, numerous rings, a bracelet and a chain were *414 recovered from the persons of defendants Facey, Casey and Coleman.
On cross-examination, Officer McMullen could not recall the defendants’ seating arrangement in the vehicle or who was driving. He was unable to recall exactly how the door locks were damaged or whether there were broken windows, but did testify to extensive body damage. Officer McMullen acknowledged at hearing that although he had arrested the defendants for a stolen car, at the point of arrest, he didn’t know whether the car was stolen. Although irrelevant to the issue of whether there was probable cause to arrest, it is noted that there are no allegations relating to a stolen vehicle and no evidence was adduced at the hearing that the Toyota was, in fact, stolen. Officer McMullen testified that further inquiry into the ownership of the Toyota was made at the precinct following arrest, but the outcome of that inquiry was not made known at the hearing.
In response to a question from the court, Officer McMullen testified that although he had approached the driver, he didn’t recall speaking to him at all, nor did he recall which of the defendants was the driver. Officer McMullen testified that he asked for documentation of ownership, which was not produced, but he was unable to recall what he said or to whom. He also was unable to recall any details of the recovery of property from the defendant Facey.
Police Officer Leiva testified that she saw the fork in the ignition and recalled that immediately thereafter the Toyota made a left turn and the police car put on its lights and "called for a backup”. She testified that she and Officer McMullen "took out the driver and the passenger of the vehicle and the other officers that responded, they took out two male occupants from the back and one fled * * * which was captured about half a block away”. She was unable to identify any of the defendants at the hearing and could not recall which side of the Toyota she had approached. She had no conversation with any of the occupants prior to their arrest.
At the conclusion of the Dunaway hearing, which was bifurcated with respect to the Wade, Mapp and Huntley issues, this court found the testimony regarding the observations of Officers McMullen and Leiva "to be credible, though not well remembered * * * except for the fork”. It was apparent from the testimony of these officers that they had no reliable *415 recollection of the events surrounding the arrest of defendants after they called for backup and the defendants’ vehicle had been stopped. From various statements made by Officer McMullen and from the testimony of Detective Santiago regarding his receipt of and response to Officer McMullen’s radio request for assistance indicating "in pursuit on Rogers and Empire”, this court infers that several police cars converged upon defendants’ vehicle simultaneously and that Officers McMullen and Leiva, though designated "arresting officers”, may not have been the officers that actually apprehended defendants. This court rejects the suggestion that the defendants’ car was not "stopped” by the police but had voluntarily stopped due to traffic congestion. Based upon the aforementioned testimony of Detective Santiago, it appears more likely that the responding backup vehicles had created the "congestion” that prevented defendants’ movement.
CONCLUSIONS OF LAW
In recently reiterating the New York rules for evaluating the propriety of police-initiated encounters previously set forth in People v De Bour (40 NY2d 210, 223 [1976]), the Court of Appeals held that the common-law right of inquiry requires "a founded suspicion that criminal activity is afoot”. "Where a police officer has a reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person.” (People v Hollman, 79 NY2d 181, 185 [1992].) Of course, such " 'reasonable suspicion’ ” must be predicated upon objective evidence of criminal activity at the time of the stop. (People v Sobotker, 43 NY2d 559, 564 [1978].)
Unquestionably, Officers McMullen and Leiva had a reasonable suspicion that the vehicle in which the defendants were travelling might be stolen based upon their observations of its condition, specifically the missing trunk lock, the damaged door lock and the presence of a fork in the ignition. Thus, the stop of the vehicle was a reasonable and justified intrusion under the common-law right to inquire, notwithstanding the fact that the officers received a negative response to their call to determine whether the vehicle had been reported as stolen.[1] *416 Those observations, standing alone, were not sufficient, however, to establish probable cause to arrest.
The People bear the burden of coming forward with proof that an arrest and attendant search were based upon probable cause. (People v Malinsky, 15 NY2d 86 [1965].) An arrest, the highest level of intrusion upon an individual’s liberty, must be based upon evidence that would lead the officers to reasonably believe that the arrestee had committed or was about to commit a crime. (People v De Bour, supra, 40 NY2d, at 223.) Behaviour that is equally capable of innocent, as guilty, interpretation will not suffice to establish probable cause for arrest. (See, People v Bigelow, 66 NY2d 417, 424 [1985].) Where circumstances are suspicious but equivocal, the common-law right to inquire permits an intrusion upon one’s liberty only "to the extent necessary to gain explanatory information, but short of a forcible seizure.” (People v De Bour, supra, 40 NY2d, at 223.)
While evidence of damaged locks and tampered ignition, coupled with a report that the vehicle was stolen, might well be sufficient to establish probable cause to arrest (see, People v Bowdoin, 89 AD2d 986 [2d Dept 1982]), such damage, without more information, provided only a reasonable suspicion warranting a stop to inquire. In fact, prior to even approaching the car, the police had confirmed, via radio, that there was no report that the vehicle was stolen. The affirmative evidence is that defendants’ vehicle was proceeding within the speed limits and all traffic regulations were obeyed by the operator.[2] Additional inquiry as to the ownership of the vehicle was therefore necessary before proceeding further. Under such circumstances, it was incumbent upon the police to afford the occupants of the car an opportunity to establish their lawful possession of the vehicle. The credible evidence indicates this was not done.
The allegations against the defendants are unrelated to their possession of a vehicle, but relate exclusively to the robbery of a jewelry store. The evidence discovered as a result of defendants’ seizure is compelling. However, an illegal arrest *417 may not be justified by a subsequently acquired suspicion. (People v De Bour, supra, 40 NY2d, at 215.) Had the arresting officers made appropriate inquiry rather than peremptorily taking defendants into custody, it is possible that suppression would not be compelled. As the record stands, however, the arrest was clearly made without the necessary foundation of reasonable cause to believe defendants had committed a crime (CPL 140.10). All fruits of the illegal arrest must, therefore, be suppressed, including the physical evidence and the custodial identifications.
Apart from the issue of whether the People have met their burden to establish probable cause for the arrest, this case presents an equally compelling issue relating to the People’s obligation under People v Rosario (9 NY2d 286 [1961]), to preserve and disclose prior written and recorded statements of their witnesses.
Police Officer McMullen testified to making several radio transmissions following his initial observations of the defendants’ vehicle. Despite a subpoena having been served, the master tape recordings of those transmissions were destroyed. The court finds, and the People do not dispute, that the master tape recordings of the radio communications which were destroyed constituted Rosario material as to the witness Police Officer McMullen.
It is well established that where Rosario material cannot be produced because it has been lost or destroyed, the court must impose some sanction upon the People for failing to fulfill their obligation. (People v Banch, 80 NY2d 610, 616 [1992]; People v Wallace, 76 NY2d 953 [1990]; People v Martinez, 71 NY2d 937, 940 [1988]; People v Haupt, 71 NY2d 929 [1988].) The nature and scope of the sanction lies within the sound discretion of the court following a determination as to the content of the missing Rosario material and the circumstances of its loss or destruction. The degree of fault in failing to preserve the material and the extent of the prejudice to the defendant are relevant considerations. An appropriate sanction may range from an adverse inference instruction to the drastic remedy of dismissal of the charges, an alternative which is not favored and which this court declines to elect.
In the instant case, the People’s failure to exercise due care to preserve the master tapes of the radio communications is inexcusable. According to the People’s own witness, a police department communication technician from the records and *418 tape unit, these master tapes, which contain the entire contents of all 911 calls and radio communications to central, are routinely destroyed 90 days after an occurrence. The only records which are maintained permanently are the Sprint reports, which are entered into a computer by a 911 operator or dispatcher and eventually stored on microfilm. According to the witness, these Sprint reports do not, however, contain a verbatim account of the transmission. Rather, they consist of a summary of the contents of the transmission based upon the dispatcher’s interpretation of the pertinent information. Thus, since these Sprint reports are not an identical transcription of the radio transmissions, they cannot be considered the duplicative equivalent of the actual recorded transmission by the officer in the field. (See, People v Young, 79 NY2d 365, 369-370 [1992].)
The People’s own evidence establishes that the extant police department policy of routinely destroying the master tape of all communications within 90 days is inconsistent with the People’s obligation to preserve Rosario material for use at trial. This procedure constitutes not merely inadvertent loss or destruction of Rosario material, but institutionalized, purposeful destruction without any regard to the potential need for its availability in a pending or future prosecution. This court finds this practice to be a willful thwarting of the discovery rules and a direct affront to the principles underlying the Rosario rule.
Even more disturbing in this case is the fact that the discovery requests, including a subpoena for these master 911 tapes, were made approximately one month after the incident, well within the 90-day period prior to destruction. No acceptable excuse has been offered for this apparently deliberate frustration of a subpoena and blatant disregard of the defendants’ rights of discovery.
While the primary focus in devising an appropriate sanction for Rosario violations is the overriding need to avoid prejudice to the defendants, the degree of prosecutorial fault is a factor to be considered. In this case, not only did the prosecution exercise routine disregard for the need to preserve potential Rosario material, but there was blatant and willful disobedience of a timely subpoena and discovery requests as well. Such fault demands imposition of a substantial sanction.
Turning, however, to the degree to which the defendants *419 have been prejudiced by the failure to preserve the Rosario material, there is no question but that there is a significant potential for prejudice. The key issue at hearing was what information the police had at the time they stopped the vehicle and placed the defendants under arrest. Determination of this issue involves not only the content of Officer McMullen’s radio communications, but also the timing of those communications.
The testimony of Detective Santiago suggests that the backup officers responding to Officer McMullen’s call for assistance may have peremptorily effected the arrest of the defendants, independent of McMullen’s observations or efforts to inquire about reports of a stolen vehicle. McMullen himself was uncertain as to the exact details of the manner in which the stop and arrest were effected. He was unable to recall, for example, whether he had received a response to his radio transmission before or after the arrest was made. Also, contrary to Detective Santiago’s testimony that there was a radio communication of a call for help and a pursuit, Officer McMullen testified that he did not call for any assistance. His testimony also indicated that, rather than pursuit, he and his partner merely followed the defendants’ vehicle for several blocks until it was stopped by heavy traffic, whereupon they flashed their signal lights for about five seconds before approaching the vehicle. Obviously, these and various other discrepancies in the testimony concerning the circumstances surrounding the arrests of the defendants make the exact details and sequence of McMullen’s radio communications all the more critical to the determination of whether there was probable cause to arrest. The destruction of the master tapes may well have significantly prejudiced the defendants.
Accordingly, the court finds that the appropriate sanction for failing to preserve the master tapes of Officer McMullen’s radio transmissions following the service of a subpoena is to strike his testimony. Even assuming, arguendo, that the People had met their burden to establish probable cause, in the absence of McMullen’s testimony, the People clearly failed to meet this burden (People v Malinsky, 15 NY2d 86, supra). The defendants’ motion to suppress the evidence obtained as a result of their illegal arrest is, therefore, granted.

. Defendants at hearing cited People v Elam (179 AD2d 229 [1st Dept], lv granted 79 NY2d 1056 [1992]), in which a broken automobile window was held insufficient even to support a stop to inquire. This court declines to apply so restrictive a precedent.

. This testimony significantly distinguishes this case from People v Jones (182 AD2d 776 [2d Dept 1992]), upon which the People rely, since the stop in Jones was initially provoked by the vehicle’s speeding and, in the course of pursuit, attempts to flee by increasing speed. In addition, the Jones vehicle contained a clear plastic bag containing bullets in plain view on the back seat, in addition to dangling ignition wires. It was the totality of these factors that gave rise to probable cause for arrest.